## Commonwealth ex rel., Appellant, v. Philadelphia.

*Public officers—Civil Service Commission—Chief examiner—Dismissal—Insubordination—Act of March 5, 1906, P. L. 83—Findings of fact.*

1. Under the Act of March 5, 1906, P. L. 83, creating a civil service commission, the chief examiner has no power or authority, except such as may be delegated to him by the commission, and he acts at all times under its supervision and subject to its direction. When he undertakes to ignore its wishes, or to disregard its directions, or to question its authority, he assumes a power never intended to be conferred upon him, and is guilty of such insubordination as will justify the commission in removing him.

2. In a mandamus proceeding against a civil service commission to compel the reinstatement of the chief examiner, who had been dismissed for insubordination, the findings of fact of the lower court are conclusive in the absence of manifest error.

Argued March 20, 1911. Appeal, No. 352, Jan. T., 1910, by plaintiff, from judgment of C. P. No. 2, Phila. Co., Sept. T., 1908, No. 1,641, on case tried by the court without a jury in suit of Commonwealth ex rel. William D. Earnest v. City of Philadelphia, Albert G. Hetherington, Henry Drake and William M. Kreider, Civil Service Commissioners of the said City of Philadelphia, John M. Walton, Controller of the said City and County of Philadephia, Murrell Dobbins, Treasurer of the said City of Philadelphia and Peter J. Hoban. Before FELL, C. J., BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Mandamus to compel reinstatement of a public officer.

SULZBERGER, P. J., filed the following opinion:

The relator became chief examiner of the civil service commission on November 23, 1906, at a salary of $2,400

per annum.   On September 4, 1908, the commission requested the relator to resign his office; he refused, and on September 8, 1908, was discharged.

The prayer is for mandamus, directing that the relator be restored and that his salary be paid.

The civil service commissioners in their return allege, in substance, that the relator, as chief examiner, failed in his duty in that he refused to mark the papers of applicants as directed by the commissioners; that his markings in many cases were unjust and inequitable; that his conduct was arrogant and insubordinate, and that he refused to follow the advice, instruction or orders of the commissioners; that on September 4, 1908, Henry Drake, one of the commissioners, in a letter to relator, stated the reason of the latter's dismissal to be "because of your refusal to follow out the directions that I gave you under authority of the Civil Service Commission," and that his dismissal was lawful.

Whether it was or not is the question in dispute.   The Act of March 5, 1906, P. L. 83, was passed to regulate and improve the civil service of the cities in the first class in this commonwealth.   Some steps in that direction had been taken before.   Indeed, the "Act to provide for the better government of cities of the first class in this commonwealth" (P. L. 1885, p. 37), commonly known as the "Bullitt Act," contained a rudimentary civil service law scattered in fragments through its several sections (art. 3; art. 12, secs. 2, 3; art. 15), but did not provide for a civil service commission.

By the twentieth section of the act of 1906, it is provided that no officer, clerk or employee appointed under the act shall be removed, discharged or reduced in pay or position, except for just cause, which shall not be religious or political, nor until he shall have been furnished with a written statement of the reasons for such action, and been allowed to give the removing officer such written answer as the person sought to be removed may desire.   In every case of such removal or reduction, a copy of the statement

of reasons therefor, and of the written answer thereto, shall be furnished to the civil service commission, and entered on its public records.

The relator contends that there was no just cause for his dismissal, and that in any event the dismissal was not in accordance with the requirements of the law.

We have carefully weighed the evidence, oral and written, and have reached the conclusion that the relator was insubordinate, and that the commissioners' judgment was correct, that his further continuance was prejudicial to the public service.

The immediate cause of his discharge arose out of the fact that the highway department needed inspectors. An examination of forty applicants was held in April, 1908, only fourteen of whom were placed on the eligible list. On May 29, 1908, there was another examination of twenty-two applicants, only three of whom were placed on the eligible list.

The highway department needed inspectors. There is no absolute standard of knowledge fixed by general law for the incumbents of this office, nor does the civil service act set up such a standard. It was enacted for another and much deeper purpose, its plain intent being to exclude partisanship, favoritism, prejudice and caprice from the appointment or removal of persons in public employment. To that end the applicants are to be compared with each other in a mode which eliminates these vicious and disturbing factors, and awards priority to the best man. An inspector of highways ought to know how level a street should be, how concrete ought to be mixed, when a street needs repair, and other related practical things. The degree of expertness required is ordinary and easily attainable by plain mechanics with limited scholastic knowledge.

When, therefore, inspectors were wanted, the commissioners determined to relax some of the more ornamental requirements, such as correctness in "punctuation and capitalization," meaning that a comma might be omitted

or wrongly placed, and that a capital letter written where there should have been a small one, or vice versa, without detriment to the highway service. They so instructed the relator. The latter, no doubt with good intentions, not only objected, but wrote the letter of August 24, 1908. It was offensively insubordinate, in that it refused to obey directions received, declared that they were erroneous, and demanded a specific reiteration of them if he was to heed them.

Executive business cannot be promptly and effectively carried on if the orders of the superior may, at the election of the inferior, be made the subject of a protracted argument. Nor is it for the good of the service that clerks, who are ready writers, should pile up records of their wise dissent from the lawful orders of their chiefs.

We think that there was just cause for the relator's dismissal.

The question must still be considered whether the mode of dismissal was in accordance with the terms of the civil service act.

The relator contends that the requirements of the above-cited twentieth section were not complied with. We entertain grave doubts whether he is within its protection. The requirement that the statement and answer "shall be furnished to the civil service commission and entered upon its public records," would seem to mean that officers of the various departments of the city government must furnish these papers to the civil service commission and appears to have no reference to the proceedings of the commission itself.

We have seen that the Bullitt act provided for civil service in a partial way, but left each department to administer it. The weakness of a law which left the appointing chiefs free to act without supervision or publicity soon became apparent. A separate body was needed, which, not having the power to remove or to appoint, might be relied on to supervise and to publish the facts concerning all the departments.

The circumstance that this civil service commission needs a few examiners and clerks is of little importance in this connection; for, if it cannot be trusted to do so little a thing as to act fairly by these, its whole activity would be merely worthless and the purpose of the act would have failed.

We need not, however, finally decide this point; for if it be waived or overruled, we are of the opinion that the proceedings were entirely regular. The statute contemplates that the officer intending to remove a subordinate must furnish him with a written statement of the reasons for such action, and must allow him to give a written answer before he actually removes him. It may be assumed that such answer will usually deny the offense charged, but whether it does or not, no mode of trial or further proceeding is provided for, save that the statement and answer become public records.

In the case before us the commissioners notified the relator orally on September 4, 1908, that they would charge him with insubordination. On the same day he acknowledged this notice in writing. The commissioners sent a written reply to this letter on the same day, informing him that the reason for his discharge was his refusal to follow the commissioners' directions, and that his services would not be required "after Tuesday, September 8."

This was a clear written statement of the commissioners' reasons, and it gave him four days' time to file his answer before their intended action would take effect. In point of fact, he prepared an elaborate answer, sent it on September 8; it was received and considered by the commissioners, was declared by them insufficient, and they dismissed him on September 8 in a written communication.

We think that the relator was not deprived of any of his privileges, and has no right to complain of his dismissal.

The prayer for peremptory mandamus is denied, and the petition is dismissed.

*Error assigned* was the judgment of the court.

*Frank P. Prichard,* with him *Albert Smith Faught, Robert D. Jenks* and *Vivian Frank Gable,* for appellant.— The only ground which authorizes a removal from the service is a "just cause" and before the employee can be deprived of his position that must be made to appear: Truitt v. Philadelphia, 221 Pa. 331.

*T. D. Finletter,* with him *James Alcorn,* for appellees.— The findings of the lower court are conclusive: Griffith v. Sitgreaves, 90 Pa. 161; Com. v. Lehigh Valley R. R. Co., 104 Pa. 89; Brown v. Susquehanna Boom Co., 109 Pa. 57; Com. v. Hulings, 129 Pa. 317; Com. v. R. R. Co., 145 Pa. 74.

OPINION BY MR. JUSTICE ELKIN, May 17, 1911:

This is a mandamus proceeding to compel the reinstatement of appellant as the chief examiner of the Civil Service Commission. He complains that his removal was without just cause and therefore illegal. He was removed on the ground of insubordination, which if true in fact, was a just cause within the meaning of the law. Every subordinate should be respectful to his superior officers, and should be willing to discharge his duties as directed. In the administration of civil service laws much must be left to those intrusted with their enforcement. This is especially true of the civil service commission which was created for the express purpose of regulating and enforcing civil service in cities of the first class. If the authority of the commission to regulate its own affairs may be lightly challenged by one occupying a subordinate position, the effective enforcement of civil service in other departments would be greatly weakened. Nothing could be more demoralizing to the public service than insubordination on the part of subordinates in the discharge of their duties. There must be a head to everything. No work is well done without the direction of competent authority. The

subordinate may think he is wiser than his chief, and may honestly believe that he knows how to do the work better, but so long as he occupies a subordinate position, his views must yield to those of his superior. Any other view would destroy efficient discipline without which there can be no such thing as orderly and well-regulated government. In this connection it may be well to glance at those provisions of the civil service act under which the chief examiner is appointed. Section 3 of the Act of March 5, 1906, P. L. 83, provides as follows: "The Civil Service Commission in each city shall employ a chief examiner and such other clerks, examiners and employees as it may deem necessary or proper to carry out the purposes of this act." The salaries of the examiners and other employees are fixed by the commission and approved by the mayor. There are no other provisions relating to these appointees. The act is absolutely silent as to what duties they shall perform, or the kind and character of services they shall render. All of these things are left to the discretion of the commission so as "to carry out the purposes of this act." It seems perfectly clear that the legislature intended the commission to exercise discretionary powers in the appointment of examiners and clerks and in the regulation of the affairs of its own household. There is nothing in the act to indicate a legislative intention to give the chief examiner, or any other employee, the authority to do any act or thing except under the supervision and direction of the commission. The power to enforce the law is lodged in the commission and not in the subordinates. The chief examiner has no power or authority except such as may be delegated to him by the commission. He acts at all times under the supervision and subject to the direction of the commission. When he undertakes to ignore its wishes, or to disregard its directions, or to question its authority, he assumes a power never intended to be conferred upon him. If he persists in setting up his views in opposition to those held by the commission he may very properly be classed as insubordinate. It is

conceded if appellant was insubordinate within the meaning of the law there was just cause for his removal, but it is contended that the facts do not warrant such a finding. In the consideration of this point we start with the presumption of good faith in the performance of public duties on the part of the commission which removed appellant. The cause assigned for the removal having been challenged, the whole controversy was carefully considered by the learned court below with the result that the commission was sustained. This is the end of the matter unless there was manifest error in the findings of the lower court. It is very earnestly argued here that the evidence did not warrant such a finding. The case is made to turn upon the question of insubordination. The evidence was largely documentary although there was some oral testimony. It may be that different minds might reach opposite conclusions from the evidence thus presented. But it has been frequently held that findings of fact will not be reversed on this ground unless there is manifest error: Plankington's Estate, 212 Pa. 235. We find no such manifest error in the findings about which complaint is made as to warrant a reversal. Indeed, the tone of the letters written by appellant to the commission indicates an unwillingness to follow instructions, and a disinclination to do his work as directed. His general attitude as indicated by his acts and letters is not saved from the charge of insubordination because he said in one letter that he would make the changes suggested if requested to do so. What occurred between a member of the commission and appellant in connection with the marking amounted to a request to make the changes. The learned court below has so found and we see no error in the conclusion reached. He must have understood, as we believe he did, that the commission desired him to change the markings as indicated by the marginal notes. Whether it was wise or unwise for the commission to adopt a policy of more liberal marking under the circumstances was a question with which the chief examiner had nothing to do. It was his

duty to follow instructions and do as the commission directed. Upon a review of the whole record we see no reason for disturbing the findings and conclusions of the learned court below.

Assignments of error dismissed and judgment affirmed.