## Cornman v. Philadelphia, Appellant.

Argued November 16, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Abraham L. Freedman,* City Solicitor, with him *Harvey Levin, Abraham Wernick,* Deputy City Solicitors and *Jerome J. Shestack,* First Deputy City Solicitor, for appellants.

*Marshall H. Morgan,* with him *Henry J. Morgan,* for appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, January 12, 1955:

Two appeals have been taken from judgments in mandamus directing the reinstatement of two former Philadelphia County employes to the positions from which they alleged they had been illegally dismissed. The City of Philadelphia was directed to reimburse plaintiffs for salaries found to have been unlawfully withheld, less money which they may have received during the period of improper dismissal. Counsel agreed that since the facts in each case were identical, the appeals should be argued together. The City states that these appeals are test cases and affect the question of the reinstatement of more than 300 other such employes.

The issue raised by this litigation grows out of the adoption of the City-County Consolidation Amendment to the Constitution of the Commonwealth, the First Class City Home Rule Act of April 21, 1949, P.L. 665, 53 PS §3421.1 et seq., and the Philadelphia Home Rule Charter adopted April 17, 1951. See *Carrow v. Philadelphia,* 371 Pa. 255, 89 A. 2d 496; *Lennox v. Clark,* 372 Pa. 355, 93 A. 2d 834.

Consolidation of County and City functions was unquestionably wise. Geographically the area of the City and of the County was identical. On occasion, governmental functions conflicted or were duplicated. In the interest of efficiency and economy, it was regarded wise to have a single directing head.

Upon *consolidation* of the City and County functions, the drafters of the enactment were confronted with a perplexing problem. *City* employes were under civil service status, whereas County employes were not.

It was most apparent that it would be unjust and inequitable to require *City* employes again to be subjected to another competitive examination for a position which they already held under the former civil service provisions. It is obvious that it would have been even more unjust and inequitable to require *non civil service* employes (in the present case former *County,* but now *City* employes) to take a competitive examination. To legislate for this situation Section A-104 of Chapter A of the Charter provided: "Section A-104. CIVIL SERVICE STATUS OF PRESENT EMPLOYEES. Employees holding positions in the classified service at the time of the adoption of this charter who were appointed after test and certification to such positions, shall be continued in their respective positions without further examination, until lawfully separated from their positions. Employees of the City at the time of the adoption of this charter and employees of any other governmental agency who may become employees of the City by virtue of amendment of the Constitution of the Commonwealth of Pennsylvania and the enactment of any legislation required by such amendment, who were not appointed after civil service test and certification shall also be continued in their respective positions provided that *within one year* after this charter takes effect or within one year after any such constitutional amendment and such legislation become effective they pass a qualifying test prescribed by the Personnel Director and approved by the Civil Service Commission. Those who fail to so qualify shall be dismissed from their positions within thirty days after the establishment of an eligible list for their respective positions. Nothing herein shall preclude the reclassification or reallocation as provided by the civil service regulations of any position held by any such employee." (Italics supplied)

The *"qualifying test"* of non civil service employes, as set forth in the annotation to the foregoing section, is described as follows: "(b) Non-civil service employees under the 1919 Charter or civil service employees thereunder not employed after a civil service test and certification automatically retain their employment status for a period of one year. To remain thereafter in the employ of the City as civil service employees they must take and pass a *qualifying examination.* The examination required is not intended to be a competitive test nor need it be a written one. Its sole purpose is to establish that a former non-civil service employee or employee [sic] not appointed pursuant to test and certification meets certain minimum qualifications necessary to perform the duties of the position which he holds. Experience and a previous record of satisfactory performance are factors to be considered in the test rating. It is not the intention of this section to take off the City payroll employees who have faithfully and creditably performed their duties of employment prior to the effective date of this Charter merely because they were not civil service employees pursuant to test and certification under the 1919 Charter. The presumption should be that such employees are qualified to continue their employment but as civil service employees. To protect the interest in the respects noted of such employees, it is required that the Civil Service Commission itself in this instance shall approve the qualifying test prescribed by the Personnel Director.

"3. *The comments above are equally applicable to County employees who may become City employees by virtue of City-County consolidation.*" (Italics supplied)

This Court considered these constitutional and statutory provisions. Chief Justice HORACE STERN, in *Carrow v. Philadelphia,* 371 Pa. 255, 89 A. 2d 496, said

(p. 259) : ". . . But the question naturally arose as to what was to be done in regard to employes of the county offices who, by virtue of the City-County Consolidation Amendment,—the likely adoption of which was then in contemplation—would become employes of the city instead of the county and who had never been under civil service regulations. *It would manifestly have been unjust to provide that such employes should thereupon automatically lose their jobs, or that they might be dismissed at the arbitrary will of their employing officer, thereby making possible the retention of a spoils system which permitted such dismissals for purely political reasons;* on the contrary, therefore, the framers of the charter obviously planned to bring all these former county employes as soon as possible under the protection of civil service, the same as governed city employes already enjoying that protection. It was evidently further thought, however, that these new city employes should not be compelled to take the regular competitive examinations required of new applicants, but that their previous service, in some cases extending over many years, should entitle them, by reason of the experience thus gained, to a less rigorous qualifying test. Accordingly it was provided by section A-104 of the Charter that those who might become employes of the city by virtue of amendment of the constitution, and who had not been appointed after civil service test and certification, should *'also be continued in their respective positions provided that within one year after this charter takes effect . . . they pass a qualifying test prescribed by the Personnel Director and approved by the Civil Service Commission',* and that those who failed so to qualify should 'be dismissed from their positions within thirty days after the establishment of an eligible list for their respective positions.' This language is so clear that he who runs may

read. The former county employes were to be given the opportunity of maintaining their positions by passing a qualifying test at some time during the period of a year. If before such opportunity were afforded them they could be discharged by their employer without cause this provision of the section would be so extremely deceptive, not to say wholly meaningless. . . ." (Italics supplied in part)

It is interesting to note in the above case that the defendants *even then* contended that, because the Consolidation Amendment provided that County officers should continue "to perform their *duties*", this means that such officials should continue to have the *power* to dismiss their employes at will. This contention was succinctly answered by the Chief Justice in the *Carrow* case, supra, (p. 261) : "Defendants urge that because the City-County Consolidation Amendment provided that the county officers should continue 'to perform their *duties*', this meant that they should continue to have the *power* to dismiss their employes at will. *Such an interpretation is wholly beyond reason.* This provision did not purport in any manner whatsoever to deal with the relations between the county (now city) officers and their employes or with the latter's employment status. As to the provision in the amendment that the county officers should continue to be 'organized' in the manner provided by the Constitution and the then existing laws, this obviously refers, not, as appellants mistakenly claim, to the county *offices,* but to the county *officers,* and covers the case of County Commissioners who were 'organized' by legislation into a board for the transaction of their business." (Italics supplied in part)

Defendants in the *Carrow* case, supra, raised two other questions not specifically treated in the text of the Charter, viz.: (a) was removal *for cause* permitted

and (b) what is the status of the employe should his services be no longer needed. In answer, this Court, again speaking through the Chief Justice in the *Carrow* case, supra, said (p. 262) : "It is defendants' final contention that, if it had been intended to continue the county office employes in their positions until they were given the opportunity to qualify by test, there would at least have been a provision that they could meanwhile be removed *for cause.* Such a provision, however, was unnecessary since it is implicit in every relationship of employer and employe that if the latter violates the conditions of his employment, and fails to render efficient service, the employment may be terminated as in the case of any other failure of a party to perform a contractual obligation.

"It remains only to add that nothing herein contained must be understood as preventing the dismissal of employes *if the positions they occupy are no longer required,*—in other words, if by reason of lack of funds or work the force should be reduced. In that event, however, as stated in the annotation of the Drafting Committee to subsection (o) of section 7-401 of the Charter, layoffs for any such reason should be determined on the basis of service efficiency and seniority considerations."

Section A-104 of the Philadelphia Home Rule Charter, supra, provides that the *"qualifying test"* relating to non-civil service employes shall be given during a fixed period, viz.: *"within one year".* Once again, speaking through our Chief Justice, we said, in *Lennox v. Clark,* 372 Pa. 355, 93 A. 2d 834, (p. 360) : "The City Solicitor has urged upon us the extreme importance of a prompt disposition of these cases in view of the fact that the Home Rule Charter provides (section A-104) that employes of any governmental agency becoming employes of the city by virtue of the City-County Con-

solidation Amendment and the enactment of any legislation required by such amendment, who were not appointed after civil service test and certification shall be continued in their respective positions provided that within one year after the Charter takes effect or within one year after such constitutional amendment and legislation become effective they pass a qualifying test prescribed by the Personnel Director and approved by the Civil Service Commission. We held in Carrow v. Philadelphia, 371 Pa. 255, 89 A. 2d 496, that *such employes were entitled to retention in service until afforded the opportunity to pass such qualifying test.* It is our judgment that the year governing is the one that began with the effective date of the Charter, January 7, 1952, but that the time thus fixed was *directory, not mandatory,* and that the employes concerned cannot be deprived of their right to take the test either because of the failure of the proper authorities to conduct the necessary examinations or because of any pre-existing uncertainty as to the law, and that, therefore, a further reasonable period of time must be allowed such employes for that purpose." (Italics supplied)

It is plain, therefore, that the drafters of the City Charter, of whom the learned City Solicitor was one, and also the voters of the City and County who accepted and enacted the Charter which the Commissioners presented, declared in most unequivocal language that after the consolidation of City and County functions the City employes already functioning under civil service should not be disturbed and that non civil service employes should be given a token or qualifying examination to impress such employes with the status of civil service employment. Thereafter the entire personnel of the *City* (except where otherwise provided) should *all* be civil service employes. Realizing that

there would be many difficult and involved legal problems in connection with the adoption and administration of the Charter and its multiple provisions, the period of *one year* was given within which the *qualifying examination* might be taken and, accordingly, this Court decided, as above recited, that such period was merely *directory* and that the employes concerned could not be deprived of their right to take such examination because of (a) *failure of the proper authorities to conduct the examination or (b) delay in the legal determination of uncertainty in the law.* Underlying the entire legal philosophy was the acceptance of the doctrine of civil service and the rejection of the practice of dismissals for purely political reason, i.e., operation under the *spoils system.* This Court decided, despite the absence of specific language in the Charter, that an employe could be dismissed for "just cause" or if the position had been discontinued or became unnecessary.

With the existence of this background we examine the facts. Plaintiff, a *County* of Philadelphia employe, was lawfully employed in the Sheriff's office on and prior to November 6, 1951. Upon the adoption of the amendment to the Constitution and the consequent consolidation, above referred to, plaintiff became a *City* employe. On January 2, 1953, *without affording him an opportunity to pass a qualifying test,* the Sheriff peremptorily discharged him. The sole notice which he received was in writing and read *"For just cause, your employment . . . has been terminated. . . ."* In defendants' answer it is alleged that the dismissal was for just and proper cause, viz.: ". . . Plaintiff was guilty of insubordination; he was inefficient and untidy in the performance of his duties; and he failed to cooperate during the process of the reorganization of the Department of the Sheriff's office." *As it is stated that the present case affects over 300 employes, it must be*

*assumed that all notices of dismissal were substantially similar.*

For reasons not too difficult to surmise, the City has appeared to be indifferent or frankly antagonistic to the letter and spirit of the Constitution and our decisions. As early as the *Carrow* case it appeared that the Sheriff dismissed a former County employe without cause. We affirmed the court below in its judgment of mandamus reinstating such employe. Obviously in the case now before us the City, in defending its attitude and position, has adopted the military strategy that the best defense is a vigorous offense. It has presented all manner of objections *against plaintiff* in seeking to evade the plain mandate of the Charter and decisions of this Court, which, however, became less convincing the more it pressed, multiplied and explained them.

We have examined the multitudinous objections. For example, it is argued that a summary judgment in mandamus should only be granted where the right is clear. But in the *Carrow* case the Chief Justice accurately stated, respecting the declared purposes of the Charter (p. 260) : "[The] language is so clear that he who runs may read." It is argued that such judgment should not be rendered *because of delay due to litigation.* This was answered in the *Lennox* case, supra. The rights of an employe certainly cannot be prejudiced or lost because the City failed to conduct the examination as required by the statute or because of litigation to settle the law. Neither are we impressed with the argument that it would be inequitable to require the defendants to reinstate such employes with back pay, if they were illegally dismissed. The fact that over 300 employes were dismissed, and not merely the two involved in this case, makes it even more imperative that the law should be obeyed and not evaded. Perhaps the most extraordinary contention of the City

Solicitor is that plaintiff should not secure relief because of legal *technicalities.* On the contrary, curiously enough, it is the *defendants* who are resorting to technicalities and not the plaintiff.

Despite the Herculean effort of defendants to dispossess all County employes contrary to the plain provisions of the Charter and this Court's decisions, the single controlling question is the legality of their dismissal and particularly the sufficiency of the method employed for the removal of such employes *"for cause".* In *Carrow v. Philadelphia,* supra, we decided a former County employe could not be discharged for political reasons but only for "just cause". As above stated, the plaintiff received a written notice which read, *"[f]or just cause"* the employment was terminated. No facts or reasons constituting "just cause" were given, however, nor were the discharged employes given any hearing or indeed any opportunity to learn the derelictions with which they were charged, and to present a defense thereto. This was a violation of fundamental justice and of the rights given them by the Charter.

When plaintiff filed his complaint in mandamus he alleged such assigned reason was insufficient at law. Defendants answered that the plaintiff was insubordinate, inefficient, untidy and did not cooperate. It is contended by defendants that this is a sufficient statement of "just cause" which raises a question of fact to be determined either by a jury or the Civil Service Commission. The discharge was invalid and the answer setting up new facts comes too late to validate it.

*It is to be remembered that the City asserts that this is a "test" case and involves over 300 employes who, it is stated, are in precisely the same position as the present plaintiffs.* Had the Charter intended that the employing officer could dismiss at his arbitrary will, the *Carrow* case would necessarily have been de-

cided the other way, and there would have been no necessity for this Court to decide that prior to the qualifying test the employe could be dismissed *"for cause"*. With the plan of the City-County consolidation so plainly outlined and interpreted by this Court, the *"cause"* for dismissal was obviously intended to be *analogous* to that "cause" which enables an employe to be removed from a *civil service job*. True, this proceeding is not before the Civil Service Commission since the qualifying test has not been given, or even prescribed by that body, and consequently such employe is not *yet* a full civil service employe. But such employe clearly must be given a notice containing facts or reasons for his dismissal with the right to answer any charge against him and a hearing thereon.

Even should plaintiff (and the other 300 or more similar employes) not possess the status of a full civil service employe until he had taken and passed the qualifying test as directed by the Charter, nevertheless, such employe is entitled to notice of the charges and a reasonable opportunity to reply. As early as 1625—three centuries ago—in *Bagg's Case,* 11 Coke Rep. 93b, 77 Eng. Rep. 1271, an almost similar case arose in England and was decided as the learned court below ruled in this one. Lord Coke said (p. 1279-80) : "And although they have lawful authority either by charter or prescription to remove anyone from the freedom, and that they have just cause to remove him; *yet it appears by the return, that they have proceeded against him without hearing him answer to what was objected, or that he was not reasonably warned, such removal is void, and shall not bind the party, quia quicunque aliquid statuerit parte inaudita altera, aequum licet statuerit, haud aequus fuerit, and such removal is against justice and right."* (Italics supplied) The translation of the Latin quotation is as

follows: *"He who decides, any matter without hearing both sides, though his decision is just, is himself unjust."* The learned counsel for appellee notes that the stated principle of law was originally from Medea, the work of the Roman philosopher and moralist, Seneca, written almost 2,000 years ago. Coke in his report of the case here adopts the quotation as a fundamental principle of law thus stated in Seneca's poetic words. Blackstone terms the quotation as the "rule of natural reason expressed by Seneca." 4 Blackstone Comm. 283. See also: *Walton v. Davis,* 188 Ga. 56, 2 S. E. 2d 603; *Thompson v. Civil Service Commission of Provo City,* 103 Utah 162, 134 P. 2d 188; *Commonwealth ex rel. Bowman v. Slifer,* 25 Pa. 23, 28; *Field v. The Commonwealth,* 32 Pa. 478; *Commonwealth ex rel. v. Gibbons,* 196 Pa. 97, 46 A. 313; *Lumley v. Hughestown Borough Town Council,* 362 Pa. 532, 534, 66 A. 2d 833.

In the present facts it is obvious that the dismissals constitute *an attempt to make possible the retention of the spoils system*—such dismissals being for purely political reasons. The device employed is transparently apparent. We are not naive enough to be persuaded that with one fell swoop over 300 County employes became so insubordinate, inefficient, untidy and uncooperative as to warrant their immediate removal "for cause". In the interest of justice, as well as for economy *under the present state of the record,* we refuse to sanction trials of fact in over 300 employe removal cases. Defendants are directed to immediately obey the mandate of the Constitution and our decisions. If the employes successfully pass the qualifying test and become City employes under civil service, they may thereafter be removed, where legally justified, in the manner provided by law.

We are not impressed with the argument of the learned City Solicitor that to reinstate over 300 illegal-

ly removed employes who have been separated from the City's service for more than two years, will result in claims against the City Treasury of more than two million dollars. Even if true, this is no valid reason against the lawful reinstatement of such illegally dismissed employes. But it is to be noted that this Court and the Superior Court have held that credit must be allowed for any amount received by the *illegally removed employe from other employers during the period of the illegal separation.* Doubtless, this will greatly reduce the amounts of the claims. See: *Seltzer v. Reading,* 340 Pa. 573, 17 A. 2d 872; *Steiner v. Reading,* 341 Pa. 164, 19 A. 2d 283; *Seltzer v. Reading,* 151 Pa. Superior Ct. 226, 30 A. 2d 177.

We have read with approval the scholarly opinion of Judge MacNeille in the court below.

The judgments are affirmed.

———

Concurring Opinion by Mr. Justice Chidsey:

These cases came before the Court on the pleadings. Preliminary objections filed by the plaintiffs in the nature of a demurrer, were sustained. It was admitted by the defendants that the plaintiffs who were sheriff's officers employed at the salary of $3,250 per annum, were discharged without notice of the charges against them or an opportunity to be heard. The crux of the case therefore is whether such notice and opportunity to be heard were a prerequisite to the action taken by the sheriff. If they were, then no ex post facto showing of cause can cure the failure to perform this condition precedent.

It was claimed on behalf of the plaintiffs that the sheriff had no right to peremptorily dismiss them because they fell within the procedural provisions pre-

liminary to dismissal established by the civil service regulations. To my mind the language of these regulations does not embrace the plaintiffs; and if it did, then the plaintiffs' remedy would be by appeal to the Civil Service Commission.

In my opinion the plaintiffs enjoyed the right to be notified of the cause for their dismissal and an opportunity to be heard, irrespective of any express legislation or regulation providing therefor, and that the same would be true in the case of employes enjoying full civil service status if there were no such provisions.

Concededly if the plaintiffs enjoyed no tenure and were merely employed at the will of the sheriff, as was formerly the case, the latter could summarily discharge them. But the City Charter provided that they should be retained until they were afforded a qualifying test. In *Carrow v. Philadelphia,* 371 Pa. 255, 89 A. 2d 496, we held that the class of employes to which plaintiffs belong must be continued in their positions until such qualifying test was given. Thus unquestionably they were given tenure of position.

It is argued that we stated in the *Carrow* case that such employes could be discharged for cause. This of course is true, and so can employes enjoying full civil service status. But that is not the point. The question is whether an employe of either class can be summarily dismissed without notice of the charges against him and the opportunity to be heard. It is asserted that this privilege or right applies only to those employed for a stated term. With this I do not agree. The tenor of textbook authorities and decisions on the subject is to the effect that tenure is the basis for the rule, which in turn rests upon the fundamental concept that one enjoying tenure of office should not, as a matter of ordinary fairness, be subjected to the opprobrium and

other adverse consequences of discharge without the opportunity to know and meet the charges against him.

In McQuillin, Municipal Corporations, 3rd Ed., Vol. 4, Sec. 12.255, pp. 332, 333, it is stated: ". . . Where power to remove is conferred and the procedure thereof is not specified, the law will imply authority to do whatever is proper to execute the power, consistent with the right of the accused to a fair and impartial hearing, which action must provide for notice, charges and opportunity to be heard. In such case the substantial principles of the common law should be observed. But if the officer is appointed during pleasure, or if the power of removal is discretionary, as explained elsewhere, the power to remove may be exercised without notice or hearing. *However, where the appointment is during good behavior, or where the removal must be for cause, the power of removal can only be exercised when charges are made against the accused, and after sufficient notice to afford him a reasonable opportunity to be heard before the officer or body having the power to remove him.".* Among numerous cases cited to the text is the decision of the Court of Appeals of Maryland, *Board of Street Com'rs of Hagerstown v. Williams,* 96 Md. 232, 53 A. 923. There the board of street commissioners were authorized to appoint policemen "subject to removal for cause". The policemen received no definite term of employment. A policeman summarily dismissed brought a mandamus proceeding for reinstatement because he had been given no notice or opportunity to be heard. The Court upheld the plaintiff's contention, and in the course of its opinion said: ". . . A removal for cause is, therefore, the only limitation fixed by the statute to their tenure. This being so an appointment is in legal effect an appointment dur-

---

* (Emphasis supplied).

ing good behavior, or so long as the appointee is competent to discharge the duties of the office or efficient in the performance of them. The term is not, therefore, indefinite, nor is it determinable at the mere will of the appointing power. True the term may be put an end to, but when terminated it must be terminated for cause. . . As the tenure of the policemen appointed under the charter of Hagerstown can be cut short only 'for cause,' it is clear that it cannot be terminated without cause. The phrase 'for cause' does not mean the arbitrary will of the appointing power, for that might be the outgrowth of mere whim, caprice, prejudice or passion, which would, in reality, be no cause at all. But the phrase 'for cause' must mean some cause affecting or concerning the ability or fitness of the incumbent to perform the duty imposed upon him. 'The cause must be one affecting the officer's capacity or fitness for the office.' 21 Am. & Eng. Ency. L. (2nd ed.) 850. Hence it must be inefficiency, incompetency, or other kindred disqualification. *This being the case the appointee does not hold at the will of the appointing power,* and the doctrine laid down in State ex rel. O'Neill v. Register and in Townsend v. Kurtz, supra, does not apply. *When the right to remove can be exercised only for specific cause, or for cause generally, the appointing power cannot arbitrarily remove the officer, and where the removal is to be had for cause the power cannot be exercised until the officer has been duly notified and an opportunity has been given him to be heard in his own defense;* 19 Am. & Eng. Ency. L. (1st ed.) 562G and note 5, or, as tersely put by the Supreme Court of Missouri: 'Where the appointment is during good behavior, or where the removal must be for cause, the power of removal can only be exercised when charges are made against the accused, and after notice, with a reasonable opportunity to be heard before the

officer or body having the power to remove. . . .' ".* The reasoning and conclusion reached in this case comport with the basal elements of justice upon which our system of jurisprudence is founded.

For the reason stated, I join in affirming the action of the court below.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE HORACE STERN:

The plaintiff in each of these cases was employed prior to November 6, 1951, in the Sheriff's Office and, in virtue of the City-County Consolidation Amendment which was adopted on that date, became an employe of the City of Philadelphia. On January 2, 1953, plaintiffs were discharged by the Chief Deputy Sheriff, with the approval of the Sheriff, "for just cause." They filed complaints in mandamus for reinstatement. The answers to the complaints filed on behalf of the defendants each averred that "Plaintiff was guilty of insubordination; he was inefficient and untidy in the performance of his duties; and he failed to cooperate during the process of the reorganization of the Department of the Sheriff's office." Notwithstanding such averment the court below entered judgments for the plaintiffs and ordered their reinstatement. Our court is now affirming those judgments.

Being convinced that the judgments thus entered and the opinion filed in support of them violate fundamental principles both of law and of procedure, I dissent for the following reasons:

(1) Because the action of the court indicates to my mind a complete misunderstanding of our decision

---

* (Emphasis supplied).

in the *Carrow* case, 371 Pa. 255, 89 A. 2d 496. What we there held was that the employes of the former county offices could not be dismissed prior to being given a qualifying test, *except for cause.* We said explicitly (p. 262, A. p. 499) : "It is defendants' final contention that, if it had been intended to continue the county office employes in their positions until they were given the opportunity to qualify by test, there would at least have been a provision that they could meanwhile be removed *for cause.* Such a provision, however, was unnecessary since *it is implicit in every relationship of employer and employe that if the latter violates the conditions of his employment, and fails to render efficient service, the employment may be terminated as in the case of any other failure of a party to perform a contractual obligation."* We reinstated the plaintiff Carrow in that case because she was discharged by the Sheriff, *admittedly without cause. Of course,* the plaintiffs in the present cases, as defendants admit, could not be dismissed *without cause* but had to be retained in their positions until given the opportunity to qualify for permanent employment by taking the prescribed qualifying test. But this court did not hold—indeed to have so held would have verged on the ridiculous—that if, while waiting for the qualifying test to be administered, an employe were guilty, for example, of stealing, or of not performing the duties for which he was being paid by the City, or for any other *just cause,* nevertheless he could not be discharged but must be given the test and, if he passed it, accepted as a permanent employe.

(2) I dissent because the majority opinion intimates throughout—indeed practically charges—that the Sheriff acted in bad faith in discharging these plaintiffs,—in other words, falsely pretended that there was just cause for their dismissal. These cases are be-

fore us purely on the pleadings, and, in the absence of a shred of testimony to warrant such an accusation, I fail to see how we can judicially ascribe bad faith to a public official. An "official act of a public official is presumed to have been performed in accordance with the law and in good faith and with a proper motive, i.e., for the purpose of promoting the public good and protecting the public interest": *Matson v. Margiotti,* 371 Pa. 188, 198, 88 A. 2d 892, 897. In *Glesenkamp v. City of Pittsburgh,* 320 Pa. 219, 181 A. 763, we said (p. 223, A. p. 765) per Mr. Justice MAXEY: "The relator attacks the good faith of the commission . . . . He claims the reclassification was a mere subterfuge to deprive him of his job. If there was bad faith in this matter the persons who exhibited it were the Mayor of Pittsburgh, the members of the Civil Service Commission, and the then city solicitor. The orderly administration of government requires that courts assume that persons holding responsible public positions act in good faith, until the contrary is clearly shown. As this court said in Com. v. Philadelphia, 232 Pa. 5, 81 A. 59, 'we start with the presumption of good faith in the performance of public duties on the part of the commission.'" Citing this case we said, per Mr. Justice DREW in *Commonwealth v. Dress,* 354 Pa. 411, 414, 47 A. 2d 197, 199: "It was proper for the learned court below to presume that the District Attorney, a responsible officer of the Commonwealth, acting under oath and in discharge of his official duty, acted in good faith. To hold otherwise on such facts or lack of them, as we have here, would be to seriously interfere with the administration of justice: . . ." *

---

* To the same effect: *Fleming v. Adamson,* 321 Pa. 28, 37, 182 A. 518, 522; *McIntosh Road Materials Co. v. Woolworth, Secretary of Property and Supplies,* 365 Pa. 190, 211, 212, 74 A. 2d 384, 394; *Tremont Township School District Appeal,* 366 Pa. 404, 409, 77 A.

(3) I dissent because, although the complaints in these cases alleged that plaintiffs were discharged without just or proper cause, the answers denied this allegation, asserted that plaintiffs *were* dismissed for just and proper cause, and further, that, as already stated, they were guilty of insubordination and inefficient in the performance of their duties. It is such an established procedural rule that where judgment is asked for on the pleadings the allegations set forth in the answer must be taken to be true that I feel tempted to assert that the present violation of that rule is without precedent in our judicial history. What the court is now holding is that the allegations thus made are *not* to be accepted as true, but that, in spite of them, and in the absence of any testimony whatever, the dismissals were not, in fact, for the reasons stated, but, as the majority opinion undertakes to say, "an attempt to make possible the retention of the spoils system—such dismissals being for purely political reasons." I fail to find in the pleadings any justification, either in procedural or substantive law, for such a departure from all norms of judicial administration.

(4) I dissent because the majority opinion is apparently permeated with the idea, and rests largely upon the proposition, that even though there may have been just cause for dismissing these plaintiffs the dismissals were illegal because of a failure to specify the reasons therefor. I know of no law, statutory or otherwise, except of course where civil service provisions are applicable, that requires an employer, whether public or private, to give a detailed statement to an employe of the reasons for his discharge. If the dismissal is actually unjustified and the employe has a contractual or other legal right to continue in his job the

2d 403, 406; *Miller v. Stoudnour*, 148 Pa. Superior Ct. 567, 570, 26 A. 2d 113, 114.

courts are open to him to vindicate his right; the controlling question is whether proper cause for his dismissal existed and not whether the reason for it was expressly explained to him. The majority opinion states that these dismissals constituted "a violation of fundamental justice" and cites as authority in support of that sweeping proposition *Bagg's Case,* [1625] 11 Coke Rep. 93b, 77 Eng. Rep. 1271, which is wholly inapposite because it did not relate to a case of employment at all but to a proceeding to disfranchise a citizen. Indeed not a single one of the other cases cited in the majority opinion deals with *employer or employe,* but only *with the removal from office of a public official,* which is quite a different matter and has no bearing whatever on the present issue. The only feature in *Bagg's Case* which is here relevant is that the court there said, as quoted in the majority opinion: "He who decides any matter *without hearing both sides,* though his decision is just, is himself unjust." Ironically enough, our court is now doing the very thing thus condemned, and violating the very principle which the majority opinion thus holds up for emulation; *it is deciding a matter "without hearing both sides";* it is *denying a hearing* to the defendant Sheriff,—the right to establish the truth of his allegation that there was in fact just cause for the dismissal of these plaintiffs.

(5) I dissent because the majority opinion states that the dismissals were a violation of "the rights given them [the plaintiffs] by the Charter." What rights? The only right plaintiffs and all similar employees had was the right to be retained in their positions until given a test to qualify for entrance into the permanent civil service, but neither in the charter nor anywhere else were they accorded any right to be immune from dismissal meanwhile *for cause.* What the present decision really amounts to is a grant to plain-

tiffs of the rights secured by the civil service regulations before they have attained a civil service status, and which, if it be ultimately found that they did give just cause for dismissal, they have precluded themselves from attaining at all. Not being under civil service regulations they cannot avail themselves of the provision of the Civil Service Commission that the appointing authority must notify the employe of the reason for his dismissal. Indeed, were they under the aegis of those regulations their present actions of mandamus could not, in any event, be maintained since the Charter provides that if an employe is improperly dismissed his recourse must be by an appeal to the Civil Service Commission, and only from the decision of that Commission, if unfavorable to plaintiffs, could they appeal to the court.

To summarize, therefore—because the assertion in the answers filed on behalf of defendants that plaintiffs were discharged for causes therein specified must be accepted as true on motions for judgments on the pleadings; and because (except under civil service regulations, to the benefit of which plaintiffs had not become entitled) there is no law making the dismissal of an employe illegal if not accompanied by a statement of the reasons therefor; and because I believe that the present decision of the court is therefore wholly unwarranted from the standpoint both of procedural and substantive law, I respectfully dissent from the present affirmance of the judgments of the court below.

Mr. Justice JONES joins in this dissenting opinion.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Majority in its Opinion introduces the stricture that "the City has appeared to be indifferent or frankly

antagonistic to the letter and spirit of the Constitution and our decisions." I cannot subscribe to this utterance and its harsh implications. I have seen nothing in the present litigation or in previous litigation while I have been a member of this Court which would warrant the charge that the City defies the Constitution and the decisions of the Supreme Court of Pennsylvania. I do see, however, in this very case that the Majority of the Supreme Court ignores its own pronouncements and decisions. In *Carrow v. Philadelphia,* 371 Pa. 255, decided only two and one-half years ago, the Majority of this Court, speaking through the Chief Justice, said that the Sheriff of Philadelphia County had no authority to dismiss an employe of his office without cause. In the printed decision in the Pennsylvania State Reports, *"without cause"* is italicized. Yet, in the case at bar, where the circumstances italicize over 300 times the dismissal of employees *with cause,* the Majority of this Court declines to give sanction to the very principle it announced in July, 1952. The Majority says: "With the plan of the City-County consolidation so plainly outlined and interpreted by this Court, the *'cause'* for dismissal was obviously intended to be *analogous* to that 'cause' which enables an employe to be removed from a *civil service job."*

Accepting this analogy as a valid one, is it contended by the Majority that if the charges brought by the City against the plaintiffs were proved to be true, the Civil Service authorities would nevertheless retain the plaintiffs in their positions? If an employe leaves outside the door the equipment of loyalty, efficiency, tidiness and cooperativeness, will Civil Service still regard him as a capable employe? Civil Service is intended to be armor plate for the faithful and the industrious, not a camouflaged facade for the disloyal and the indolent.

There is nothing in the Constitution, the Charter, the law, Civil Service regulations and in the whole world of common sense which says that the head of any responsible establishment is compelled to use in the execution of his duties the dawdling, inattentive, slovenly forces of insubordination, inefficiency, untidiness and uncooperativeness. If a formula had to be devised for the disintegration of society, the disorganization of the law, the battering down of human respect and the incubation of contempt for all authority, it would be one composed of universal insubordination, inefficiency, untidiness and uncooperativeness.

In the building of the Charter, I would suppose that the last thought entertained by the architects was that they should construct indestructible niches of security for the drones who would sleep away their days, stirring only when they heard the footsteps of the paymaster. In the *Carrow* case this Court specifically repudiated any such thought by saying that regardless of Charter, "it is implicit in every relationship of employer and employe that if the latter violates the conditions of his employment, and fails to render efficient service, the employment may be terminated as in the case of any other failure of a party to perform a contractual obligation."

The defendant City specifically charges that the plaintiffs have failed to render efficient service. Why does the Majority therefore disregard its own pronouncement of June 24, 1952, and refuse to permit termination of an employment in which one of the parties fails to live up to his contract to perform efficient service? In contemplating judgment on the pleadings, all averments properly pleaded by the opposing party must be accepted as true. (*London v. Kingsley, 368 Pa. 109.*) The City avers inefficiency on the part of the plaintiffs. By the very criterion laid down in the

*Carrow* case, judgment for the plaintiffs here is utterly unjustified.

The Majority quotes in support of its position Section A-104 of Chapter A of the Charter. A-104 was intended as a temporary shelter while the more substantial structure of permanent tenure was being built. It was to protect city employes with civil service rating and county employes who were awaiting the opportunity to pass a qualifying test, but it was never intended to provide a perpetual domicile for the idlers and the bunglers.

The whole concept behind the Charter movement was to bring a better government to Philadelphia. But the Majority Opinion would suggest that the purpose of the charter was to perpetuate the *status quo.* The Superintendent of a building operation who is compelled to use equipment that is faulty as well as employes who are indifferent and incompetent will never get his building completed. If, in this reorganization of the government of the largest city in our Commonwealth, the officials elected by the people may not weed out employes who, through sloth and dereliction of duty, will not allow the job to be done, the whole charter movement will have become a mockery, a delusion and a sham.

The Majority treats rather summarily the very serious matters raised by the defendant City. A vital phase of this litigation is the obvious laches practised by the plaintiffs. Laches in a case of this kind is not a technical defense, it goes to the very heart of the controversy. In a situation where jobs are involved, and especially jobs in a reorganizational enterprise, one must be prompt to assert his rights because all work must be kept moving. The plaintiffs waited for a year after dismissal before making any complaint. The Majority criticizes the City for not having supplied the

plaintiffs with reasons for their dismissal, but in this connection it is to be noted that the plaintiffs never asked for reasons as to why they had been discharged. It is possible that, like the child who is being whipped by his parent without explanation, they knew the cause of their dismissal without requiring specifications.

Two years have now passed since the plaintiffs were discharged. A similar period of time has elapsed since the others of the 300 employes were discharged. In the meantime the entire occupational picture has changed. Positions have been abolished, new employes have been hired, functions have been transferred from one office to another, various offices have been consolidated. While the plaintiffs and the others of the 300 were sleeping on their alleged rights the gigantic project of overhauling the City and County Governments of Philadelphia was proceeding apace. In point of efficient administration it is currently impossible to fit 300 employes into the precise jobs they once held. Three hundred eggs have been scrambled. The Majority in effect orders these eggs to be unscrambled and the contents restored to their original individual shells, but it offers no advice, guidance or instruction as to how this extraordinary feat is to be accomplished.

Since the plaintiffs were dismissed, other salaries have been paid. Are the taxpayers of Philadelphia to be required to pay two sets of salaries for one piece of work, just because the plaintiffs were indifferent to the responsibility resting upon them to have their rights adjudicated with dispatch? The Supreme Court of the United States spoke with forceful wisdom on this very subject in the case of *Arant v. Lane,* 249 U. S. 367, 372, when it said: "When a public official is unlawfully removed from office, whether from disregard of the law by his superior or from mistake as to the facts

of his case, obvious considerations of *public policy* make it of first importance that he should *promptly take action* requisite to effectively assert his rights, to the end that if his contention be justified the Government service may be disturbed as little as possible and that two salaries shall not be paid for a single service. . . Such a long delay must necessarily result in changes in the branch of service to which he was attached and in such an accumulation of unearned salary that, when unexplained, the manifest inequity which would result from reinstating him renders the application of the *doctrine of laches to his case peculiarly appropriate in the interests of justice and sound public policy.*" (Emphasis supplied.)

No court should render judgment without mentally envisioning what its decree will physically bring to pass. The granting of judgment for the plaintiffs here without trials as to the facts can only produce indescribable confusion and disorganization highly destructive of the laudable objectives of the whole Charter plan.

A direct issue of fact has been raised by the pleadings. The plaintiffs complain that they were dismissed *without* cause, the City charges that the plaintiffs were dismissed *with* cause, specifying that each of the plaintiffs was guilty of insubordination, inefficiency, untidiness in the performance of his duties and uncooperativeness in the reorganizational processes of the Sheriff's office. If a head-on contradiction like this does not raise a question of fact, then the word "fact" which has heretofore been the symbol of the concrete and the objective has now entered into the vaporous world of the vague, the mysterious and the unknown.

The Majority quotes in its Opinion the Latin epigram "Quia quicunque aliquid statuerit parte inaudita altera, aequum licet statuerit, haud aequus fuerit—

"He who decides any matter without hearing both sides, though his decision is just, is himself unjust." With all respect to my colleagues of the Majority I find myself compelled to the observation that the Majority is doing exactly what the Latin philosopher treated with classic irony. The Majority is refusing to give a hearing to both sides. The defendants have declared under oath that the plaintiffs do not possess the qualifications required for the jobs they hold. The defendants ask for an opportunity to demonstrate to a jury that the plaintiffs do not measure up to the standards that even a Civil Service board might establish. The defendants want to know if the taxpayers of Philadelphia should be required to pay money to persons who refuse to do their work properly, who bungle their tasks, who are slovenly at their jobs and who decline to cooperate with their fellow-employes.

The Majority declines to allow the defendants the opportunity to be heard by the only tribunal set up by the law to hear this disputed question of fact—a jury. The Majority arbitrarily declares that it refuses "to sanction trials of fact in over 300 employe removal cases." The Majority says that it makes this decision "in the interest of justice, as well as for economy." How does the Majority know that in those 300 cases, there is not one drone, not one hanger-on, not one clock-watcher? How does it know that there are not one hundred who were wont to show up at their offices only to receive their pay checks and then were to be seen no more until the following pay day? What omniscience does the Majority possess that it can assume that these 300 employes are models of efficiency and deportment and render service for every dollar taken from the public treasury? The Majority says it will not permit trials for these 300. The Supreme Court has the power to refuse these trials, but in doing so, it

cannot escape the observation that it has itself presented: "Quia quicunque aliquid statuerit, parte inaudita altera, aequum licet statuerit, haud aequum fuerit."