## Commonwealth *v.* Dress, Appellant.

412

Argued April 11, 1946. Before Maxey, C. J., Drew, Linn, Stern, Patterson, Stearne and Jones, JJ.

reargument refused June 25, 1946.

*William A. Gray,* with him *Francis T. Anderson* and *Charles H. Brunner, Jr.,* for appellant.

*J. Stroud Weber,* Assistant District Attorney, with him *Frederick B. Smillie,* District Attorney, for appellee.

Opinion by Mr. Justice Drew, May 27, 1946:

Raymond Dress, Sr., was found guilty of the crime of sodomy with his eight-year-old adopted son. His motion for a new trial was denied, and he was sentenced to "pay a fine of $200.00 to the Commonwealth, pay costs of prosecution, and undergo imprisonment at labor in Montgomery County Prison for not less than eighteen (18) months nor more than three (3) years." An appeal was taken to the Superior Court, where the action of the court below was affirmed, and from that judgment, we granted this appeal.

Defendant contends that a new trial should be granted for the following reasons: (1) That the trial judge erred in permitting the District Attorney to con-

verse with the child witness in the absence of defendant and his counsel, during an interruption in the direct examination of the witness, and after said witness had refused to incriminate defendant; (2) that the trial judge also erred in refusing to permit the mother of the child witness to talk to him in the court room during the trial, either alone or in the presence of the District Attorney, and (3) that the Commonwealth failed to meet the burden of proving defendant guilty beyond a reasonable doubt.

As to the first contention, it appears that at the trial this young boy was called to the stand, and for approximately forty-five minutes he was examined by the assistant district attorney, who was trying the case for the Commonwealth, and interrogated by the trial judge. From the record it appears that during all this time he sobbed and cried, and failed and refused to incriminate his adopted father, defendant in any way. After the expiration of a five minute recess, called by the trial judge, the District Attorney himself (who had talked previously to the boy on several occasions and who had examined him before the grand jury, and knew what the boy had told probation officers and others) came into the court room and, out of the hearing of the jury, requested permission of the court to talk to the witness in private "in order to see if he will repeat on the stand what he has already told me and the Grand Jury." Over objection of defendant's counsel permission was granted, and in a nearby room the District Attorney alone talked with the boy for a period of three minutes. The trial was resumed and with the permission of the court, the District Attorney conducted the direct examination of the child. The boy then testified, incriminating defendant, and was subjected to cross-examination.

It has been repeatedly said by this Court that a trial judge has power to control the course of the trial, limited only by statute and constitutional requirements: *Thompson v. American Steel & Wire Co.*, 317 Pa. 7, 175 A. 541;

*First Nat. Bk. of Pittsburgh v. Baird,* 300 Pa. 92, 150 A. 165. The examination of witnesses has always been and still remains subject to the control of the trial court in whom there is vested a large discretion: *Koenig v. Bauer,* 57 Pa. 168; *Hoffman v. Berwind-White C. Min. Co.,* 265 Pa. 476, 109 A. 234. There is nothing in the record to even suggest that the District Attorney used any improper means to influence the boy to testify. It was proper for the learned court below to presume that the District Attorney, a responsible officer of the Commonwealth, acting under oath and in discharge of his official duty, acted in good faith. To hold otherwise on such facts or lack of them, as we have here, would be to seriously interfere with the administration of justice: *Glesenkamp v. City of Pittsburgh,* 320 Pa. 219, 181 A. 763.

As to defendant's second reason in support of his motion for a new trial, we are satisfied that it was adequately answered by the learned court below, as follows: "Nor do we think the trial judge erred in refusing to permit the mother of the boy to talk to him in the court room, either alone or in the presence of the prosecuting attorney during the trial. The mother had left her husband and adopted child on May 12, 1944, and had not seen him during his three-month stay in the House of Detention. She left because the child made her nervous. No good purpose would have been served to permit her to question the witness after he had testified under oath. She testified on behalf of her husband. However, at the close of court on the day of trial, and before the charge of the trial judge, the mother and grand-mother visited and talked with the boy at the House of Detention. Such refusal was not an abuse of discretion, under the peculiar circumstances of this case."

However, the third contention of defendant is clearly meritorious. We are convinced that it was error not to have granted a new trial under the circumstances presented by this record, for it is very doubtful if a jury

could properly find beyond a reasonable doubt that defendant was guilty. Although granting or refusing a new trial is peculiarly a matter for the trial court, its ruling will be reversed where there is a clear abuse of discretion: *Huntzinger v. Wileman,* 353 Pa. 274, 45 A. 2d 7; *Yago v. Pipicelli,* 343 Pa. 222, 22 A. 2d 699; *Brotherhood of Eng. v. Douglas,* 152 Pa. Superior Ct. 443, 33 A. 2d 59. Here, defendant was in a desperate situation, which may have been caused by no fault of his own. The crime charged tended to prejudice him. His guilt was determined by his vacillating eight year old adopted son. The boy's testimony was seriously affected by his refusal to incriminate his father during forty-five minutes of examination by the assistant district attorney and the trial judge. It was only after a private session with the District Attorney that the child later testified as to the crime charged. Upon cross-examination, he was most uncertain as to the time and manner of the alleged immoral acts. The boy's mind was clearly open to suggestion. Defendant strenuously insisted the boy was not telling the truth and that one Annette Bodette, a housekeeper, for malicious reasons had prompted the boy to tell the story he did. Defendant's attorney on cross-examination asked him the following questions: "Q. You understand me, and it was then on Friday afternoon for the first time that you ever told her anything, isn't that right? A. That's right. Q. And really it was her that made up this story, wasn't it? A. *Yes.* Q. It was she that made up the story? A. *Yes.* Q. I don't want you to answer this unless you are perfectly sure about it, because I don't want to confuse you, she put the words of the story in your mouth, didn't she? A. *No.*" (Italics added).

Defendant contends that this housekeeper plays an important part in this case. He said he employed her as a result of a newspaper advertisement after he and his wife had separated; that she gave her name as Annette LeBlanc but subsequently called herself Annette Bodette.

He said he employed her for a period of three weeks, during which she suggested that they enter into meretricious relations; that he repulsed her and that then she became unfriendly. He said she knew he could not keep her because he told her he was sending the boy to a summer camp. It was to this housekeeper the child first told the story about the alleged immoral relationship; it was she who started the action against defendant, testifying with the child before a magistrate. She did not appear at the trial and her absence was not explained.

Many witnesses testified to defendant's good reputation; that he is employed by a well known business concern, and that he is highly considered in the community. Even his wife, from whom he was separated, appeared at the trial and testified in his behalf. She gave as one of the reasons for their separation, difficulties arising because of the conduct of the child. She said that "the boy was very stubborn, very hard to manage. I am afraid I did not understand him. He did not get along well with children and there was constant friction among the neighbor's children with him and he caused me considerable strain and stress. He did not like school, he hated to do his homework and refused to do it and his father worked with him and made him do it. I felt he was a psychiatric case, he couldn't seem to tell the truth or distinguish between the truth and what was a lie. It just got too much for me." It is upon the testimony of this boy alone, certainly doubtful in any aspect, that defendant was found guilty of degenerate practices with his own adopted son.

This is not a case of conflict in the evidence, but one in which we are all satisfied that a great wrong or injustice may be done unless a new trial is granted defendant.

Judgment reversed, with a venire facias de novo.