352 A.2d 26

COMMONWEALTH of Pennsylvania Appellant,

v.

Paul FISHER, Appellee (two cases).

Supreme Court of Pennsylvania.

Argued July 1, 1975.

Decided Jan. 29, 1976.

Rehearing Denied March 6, 1976.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Harry Spaeth, Philadelphia, for appellant.

Charles Lowenthal, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Justice.

About 3:59 p. m. on July 22, 1974, Robert Clanton was fatally shot on Catherine Street in Philadelphia. Paul Fisher suffered a gunshot wound of the knee in the same incident and following the injury made his way to Graduate Hospital. About 4:30 p. m. Fisher was questioned by a Philadelphia police detective, while he was lying on a stretcher in the hallway of the hospital, as to how he

was shot. Fisher said nothing inculpatory but his explanation of how he was shot included inconsistencies. The detective then phoned police headquarters and was told of the Clanton homicide. Shortly thereafter, Fisher was taken to a ward in the hospital and when "several gang boys" attempted to enter the ward, a police guard was placed at the door. About 7 p. m. Fisher was again questioned by the same detective for "a few minutes" about how he suffered the gunshot wound.

About 6 p. m. on July 24, 1974, the detective returned to the hospital to question Fisher further about how he suffered his injury and also what he knew concerning the Clanton shooting. When the detective told Fisher one Warren Sexton had been named as "the shooter of Robert Clanton," Fisher said, "Warren Sexton wasn't there at all." The detective then said, "Well, if you know Warren Sexton wasn't there, then you must know more about what happened—You must know who was there." Fisher replied, "Well, Warren Sexton wasn't there. He didn't shoot him. I did." For the first time Fisher was then given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

A few moments later Fisher's mother and an aunt entered the ward to visit him and the detective said to Fisher "he had better tell his mother what he had told me." Then in answer to questions by the detective, Fisher went on to tell that he shot Clanton and also shot himself accidentally with the same gun. The questions and answers were recorded in handwriting by the detective. Fisher refused to sign this writing and was advised by his mother not to say or do anything further until he talked with a lawyer.

Fisher was subsequently indicted for the murder of Clanton and also for possession of instruments of crime (the gun with which Clanton was shot). Fisher's attorney then filed a motion to suppress the evidence of "all

statements, both oral and written" given by Fisher to the police. An evidentiary hearing ensued wherein the only witness was the police detective who questioned Fisher on three occasions in the hospital. The detective's testimony is the source of the circumstances of Fisher's questioning set out as facts above. At the conclusion of the testimony, the hearing judge entered an order suppressing all evidence of Fisher's inculpatory statements concerning the Clanton killing. At the same time, the judge dictated to the court reporter in open court his findings and conclusions in support of the suppression order.[1] The Commonwealth filed an appeal in this Court from the suppression order in so far as it related to the murder indictment pending against Fisher.[2] A related appeal was filed in the Superior Court from the court's suppression order in so far as it concerned the indictment charging possession of instruments of crime. This last mentioned appeal was later transferred here. The two appeals were consolidated in this Court.

██ The law is clear that any admissions made by a criminal defendant, which are not preceded by *Miranda* warnings and which are the product of custodial interrogation, should be suppressed and precluded from evidentiary use at trial. *Miranda v. Arizona,* supra and *Commonwealth v. D'Nicuola,* 448 Pa. 54, 292 A.2d 333 (1972). Instantly, the suppression court concluded that Fisher was placed under arrest (without a warrant but with probable cause) on July 22, 1974, that the questioning that ensued on July 24th was "custodial interrogation" and that all of Fisher's self-incriminations on that date were the product of that interrogation. The correctness

---

1. Rule 323(i) of the Pennsylvania Rules of Criminal Procedure requires that at the conclusion of a hearing on a motion to suppress evidence "the judge shall enter on the record a statement of his findings and conclusions of law . . . ."

2. Under the circumstances, the Commonwealth may appeal. See *Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304 (1963), and *Commonwealth v. Melton,* 402 Pa. 628, 168 A.2d 328 (1961).

of the legal conclusion is challenged by the Commonwealth and is subject to appellate review. *Commonwealth v. Harmon,* 440 Pa. 195, 269 A.2d 744 (1970).

First the Commonwealth contends Fisher was not the subject of custodial interrogation when he said on July 24th, "Well, Warren Sexton wasn't there. He didn't shoot him. I did." We disagree.

■■ In determining if the questioning of Fisher on July 24th was "custodial interrogation", the test is not whether there was a prior formal arrest or whether the police detective intended to effect an arrest. "[T]he test for custodial interrogation 'does not depend upon the subjective intent of the law enforcement officer-interrogator, but upon whether the suspect is physically deprived of his freedom of action in any significant way or is *placed in a situation in which he reasonably believed that his freedom of action of movement is restricted by such interrogation* . . .' ". *Commonwealth v. O'Shea,* 456 Pa. 288, 292, 318 A.2d 713, 715 (1974), cert. denied, 419 U.S. 1092, 95 S.Ct. 686, 42 L.Ed.2d 685, citing *Commonwealth v. Romberger,* 454 Pa. 279, 283, 312 A.2d 353, 355 (1973), and *Commonwealth v. Marabel,* 445 Pa. 435, 441, 283 A.2d 285 (1971). [Emphasis in original.] Here Fisher was placed under police guard which continued for approximately forty-eight hours before he incriminated himself. Additionally, his initial incrimination came during a third period of police questioning. Under such circumstances, certainly Fisher would "reasonably believe his freedom of action of movement" was restricted.

■■ Next, the Commonwealth contends Fisher's initial self-incrimination was volunteered and not the product of police questioning. While it is true that "any statement given freely and voluntarily and without compelling influence" is admissible in evidence against the maker even in the absence of *Miranda* warnings

(*Miranda v. Arizona,* 384 U.S. at 478, 86 S.Ct. at 1630), we are not convinced Fisher's initial inculpatory statement came without "compelling influences." Cf. *Commonwealth v. Simala,* 434 Pa. 219, 252 A.2d 575 (1969), and *Commonwealth v. Mercier,* 451 Pa. 211, 302 A.2d 337 (1973). As we pointed out in *Commonwealth v. Simala,* supra 434 Pa. at 226, 252 A.2d at 578, " '[I]t is not simply custody plus "questioning" as such, which calls for the Miranda safeguards but custody plus police conduct . . . *calculated to, expected to, or likely to evoke admissions.*' " [Emphasis added.] See also *Commonwealth v. Young,* 455 Pa. 303, 314 A.2d 242 (1974). A police guard was at Fisher's hospital door continuously for forty-eight hours before he incriminated himself. He had been questioned on three separate occasions by the police detective. The third period of questioning was directed to the Clanton homicide. The initial self-incrimination came after the interrogating officer suggested, "[I]f you know Warren Sexton wasn't there, then you must know more about what happened . . . ." When these circumstances are considered in totality, it can hardly be said that the detective's conduct and questioning was of a neutral nature and not expected to evoke admissions against Fisher's interest.

Finally, the Commonwealth contends that evidence of the incriminations made by Fisher, in the presence of his mother recorded in handwriting by the detective should not have been suppressed because this evidence came into being after Fisher was given the required *Miranda* warnings. In response to this, it suffices to say that the Commonwealth has failed to sustain its burden of proving that these admissions were removed from the taint of the questioning that went before. Cf. *Commonwealth v. Banks,* 429 Pa. 53, 239 A.2d 416 (1968). See also Pa.R.Crim.P. 323(h).

Order affirmed.

POMEROY, J., filed a dissenting opinion in which JONES, C. J., and NIX, J., join.

POMEROY, Justice (dissenting).

While the facts of this case pose an extremely close question, I must respectfully dissent. In my view, Fisher was neither under arrest, subject to custodial interrogation, nor the focus of the investigation at the time he confessed to the slaying. Rather as I read the facts, the confession in the hospital on July 24 was uttered in response to a question posed by the police to Fisher as a possible witness as part of an investigatory fact-finding process. Cf. *Commonwealth v. Bordner,* 432 Pa. 405, 411, 247 A.2d 612, 615 (1968). Indeed, the record of the hearing below indicates that the police questioned Fisher on July 24 in an effort to corroborate information they had that one *Warren Sexton* had committed the slaying. Under these facts, I can only conclude that Fisher was being interrogated to determine whether he had any information relevant to the homicide, not whether he committed it.

Furthermore, the fact that Fisher's hospital room was placed under police guard while he was incapacitated does not, under these facts, demonstrate that he was or that he believed himself to be the subject of custodial interrogation. The record below indicates that the guard was placed by Fisher's door to *protect* Fisher from "gang boys" who were trying to find him. While under some circumstances the presence of such a police guard might be misunderstood and translated into a reasonable belief that freedom of movement is being restricted, such is not the case here. There is absolutely no indication in the record that Fisher thought that he was under a restrictive rather than protective guard, or, even more significantly, that he was under a guard at all. Under these facts, I do not see how it can be said that Fisher entertained a reasonable belief that his movement was

being restricted. Accordingly, in my view, under the record as developed, the statements made by Fisher should not have been suppressed.

JONES, C. J.,and NIX, J., join in this dissenting opinion.