533 A.2d 74

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Fredric JERMYN, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 28, 1987.

Decided Oct. 15, 1987.

464

Dale F. Shughart, Jr., Carlisle, for appellant.

J. Michael Eakin, Dist. Atty., M.L. Ebert, Asst. Dist. Atty., Marion E. MacIntyre, Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.

This is an automatic direct appeal[1] from a sentence of death imposed upon appellant Fredric Jermyn by the Court of Common Pleas of Cumberland County following his conviction of first degree murder, arson and aggravated assault. For the reasons that follow, appellant's convictions and judgments of sentence must be affirmed.

### I.

Appellant was arrested on January 4, 1985, and charged with criminal homicide, arson and aggravated assault in connection with the death of his mother, Mrs. Mildred Jermyn, age eighty, at her home at 305 James Street, Mechanicsburg, Pennsylvania, on January 1, 1985. After a preliminary hearing he was held for trial on all counts. A notice of insanity or mental infirmity defense was filed on appellant's behalf on April 9, 1985. Appellant's pre-trial motions to suppress evidence, to bifurcate his trial and to

---

1. *See* 42 Pa.C.S. §§ 722(4), 9711(h)(1).

have the death penalty declared inapplicable were denied on July 16, 1985. Appellant was tried before a jury from August 12 to 16, 1985, and was convicted of first degree murder, arson and aggravated assault. After a sentencing hearing on August 17, 1985, the jury returned a verdict of death. Post-verdict motions were denied and appellant was sentenced on April 15, 1986, to death, to a concurrent ten-to-twenty year prison term on the arson conviction, and to a five-to-ten year term on the aggravated assault count to run consecutive to the arson sentence and concurrent with the sentence of death. Appellant's subsequent motion to modify the sentences was denied on April 23, 1986. This direct appeal followed.

## II.

■ Appellant raises thirteen issues concerning the guilt and sentencing phases of his trial. Before considering those assignments of error, however, we must, in accordance with our practice in all cases in which the death sentence has been imposed, independently review the record to determine whether the evidence adduced is sufficient to sustain a verdict of first degree murder. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1452 (1983). Our well-established standard in conducting this inquiry is whether the evidence and all reasonable inferences therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to establish the elements of that offense beyond a reasonable doubt. *Commonwealth v. Nelson,* 514 Pa. 262, 523 A.2d 728 (1987); *Commonwealth v. DeHart,* 512 Pa. 235, 516 A.2d 656 (1986). The Crimes Code defines murder of the first degree as "[a] criminal homicide ... committed by an intentional," *i.e.,* "willful, deliberate and premeditated killing." 18 Pa. C.S. § 2502(a), (d). *See Commonwealth v. Nelson, supra,* 514 Pa. at 270, 523 A.2d at 732.

■ Viewed in accordance with our standard the evidence presented in the instant case established the following

facts. Appellant and his mother, the victim, were the sole residents of his mother's house in Mechanicsburg. By late 1984 the relationship between the two had become so strained that Mrs. Jermyn revoked a will, drafted in 1981, which had named appellant as her sole heir and executor, and had her attorney draft a new will devising her Mechanicsburg property and the residue of her estate to a niece. Appellant was to receive half the proceeds of the sale of the real estate only if the niece declined to live in the Jermyn home, with the further condition that appellant would be entitled to those funds only if Mrs. Jermyn died of natural or accidental causes. Simultaneously with the execution of the new will, Mrs. Jermyn had her attorney draft a letter notifying appellant of his eviction in sixty days, *i.e.*, on or about January 1, 1985. Appellant was aware of the terms of the new will and received his eviction notice, which angered him. Appellant told Eugene Gramm, a former employee of appellant's leather business, Fast Fred's Motorcycle Accessories, that he was going to kill Mrs. Jermyn. Appellant made no preparations to move out.

On the evening of December 31, 1984, appellant entered his mother's room, beat her with a blunt object, and strangled her to unconsciousness. He then attempted to ignite her mattress by placing cigarettes under her sheets; Mrs. Jermyn reputedly smoked in bed. When this failed, appellant lit the mattress in three separate locations with an open flame, and left the house. The fire filled the room with soot and produced sufficient carbon monoxide to cause Mrs. Jermyn's death by asphyxiation. After visiting several bars, appellant returned home at about 4:00 a.m. on January 1, 1985, and went to bed. At approximately 1:39 p.m. the following afternoon, appellent called an emergency telephone number and told the dispatcher: "Yeah, there's a funny stink comin' out of my mom's bed room [sic] and she won't answer the door." R.R. 396a. Appellant further stated that the door to his mother's room was locked and he couldn't get in, a statement he repeated to the chief of police when he responded to appellant's emergency call. The police chief used a screwdriver to open the door and

discovered Mrs. Jermyn's body on the floor just inside. An autopsy subsequently revealed that among the injuries sustained by Mrs. Jermyn were bruises which could have been produced by a studded armband appellant was seen wearing at a bar on the evening of December 31, 1984. A similar armband was recovered during a search of appellant's automobile.

On January 2, 1985, appellant visited Eugene Gramm, whom he had previously informed of his intention to kill Mrs. Jermyn, and told him "I did it." R.R. 593a. Appellant asked Gramm to drive him to New York but Gramm refused. Gramm reported this conversation to the police the following day. While incarcerated in the Cumberland County Prison after his arrest on January 4, 1985, appellant told Dean Barnes, a fellow inmate, he was glad he "torched the bitch." RR 623a, 624a. Appellant also informed Barnes that, in support of his insanity defense, he was going to tell the jury that he had done the world a favor, and that "his mother had come from Satan and he had sent her back to Satan." RR 623a.

The above evidence is clearly sufficient to support appellant's conviction of first degree murder.

We turn now to appellant's arguments in support of the award of a new trial. Appellant's first argument is that he was denied his constitutional right to be heard by the rulings of the trial court, or alternatively, that trial counsel was ineffective in failing to implement a strategy that would have permitted the exercise of that right. In our view, the true nature of this objection is misstated. The right of an accused to testify in his own behalf is a fundamental tenet of American jurisprudence and is explicitly guaranteed by the Pennsylvania Constitution. Pa. Const. Art. I, § 9. The decision as to whether to exercise that right is personal to the accused. *See Commonwealth v. Clayton*, 496 Pa. 492, 437 A.2d 1147 (1981). We have never held, however, that our constitution confers upon criminal defendants an unfettered right of self-expression in the courtroom during the guilt-determination phase of trial.

Rather, the right to be heard is, as always, circumscribed by the rules of evidence. *See Commonwealth v. Greene,* 469 Pa. 399, 366 A.2d 234 (1976); *Commonwealth v. Phelan,* 427 Pa. 265, 234 A.2d 540 (1967), *cert. denied,* 391 U.S. 920, 88 S.Ct. 1803, 20 L.Ed.2d 657 (1968).

In the instant case appellant, against the advice of counsel and after an unsuccessful attempt to dispense with his attorney, did take the witness stand and was questioned by defense counsel as follows:

BY MR. LYSAGHT:

Q. Mr. Jermyn, please state your full name and address for the record?

A. My full name is Fredric Jacob Berr Jermyn.

Q. And you are currently residing at?

A. Cumberland County Prison, Cellblock B, Cell 4.

Q. Now, prior to the prison where were you living?

A. The Audubon Motel.

Q. Why were you living at the motel?

A. Police said I couldn't stay at my house.

Q. Now, Fred, what is you reaction about what is going on?

A. It's sort of like ...

MR. EBERT: I'm going to object.

THE COURT: Sustain the objection.

BY MR. LYSAGHT:

Q. Fred, would you like to make any statement to the ladies and gentlemen of the jury?

A. Yes, I would.

MR. EBERT: Objection.

THE COURT: Sustain to the form of the question. Ask questions, counsel.

MR. LYSAGHT: Thank you, Your Honor.

BY MR. LYSAGHT:

Q. Fred, has this experience been stressful to you?

A. No.

Q. Did this experience cause you to write any poetry?

A. Yes.

Q. Would you care to read that poetry?

A. Yes.

MR. EBERT: Your Honor, I am going to object to the relevancy of the poetry.

THE COURT: Sustained. Next question.

MR. LYSAGHT: That's all we have, Your Honor.

RR. 780a–782a.

From the foregoing it is obvious that appellant's quarrel is not with the denial of his right to be heard but with limitations imposed by the trial court as to the content of his testimony. Appellant sought to make a statement to the jury but was required, instead, to comply with the formalities of a normal criminal trial by answering specific questions. When defense counsel nevertheless asked appellant if he would like to read his poetry to the jury, the Commonwealth objected on relevancy grounds. The proper focus in reviewing this assignment of error, therefore, is whether the proferred evidence was indeed relevant.

A trial court's rulings on evidentiary questions are committed to its sound discretion and will not be disturbed on appeal absent a clear abuse of that discretion. *Commonwealth v. Cargo*, 498 Pa. 5, 444 A.2d 639 (1982); *Commonwealth v. Cargo*, 498 Pa. 5, 444 A.2d 639 (1982); *Commonwealth v. Scott*, 469 Pa. 258, 365 A.2d 140 (1976). The test for determining relevancy is whether the evidence sought to be introduced tends to establish a material fact or make a fact at issue more or less probable. *Commonwealth v. Brown*, 489 Pa. 285, 414 A.2d 70 (1980); *Commonwealth v. Scott*, 480 Pa. 50, 389 A.2d 79 (1978); *Commonwealth v. Hickman*, 453 Pa. 427, 309 A.2d 564 (1973). The apparent purpose of appellant's reading of the poem was to support his defense of insanity through his demeanor on the witness stand and the manner in which he read the poem. To be relevant, evidence of appellant's mental state would have

been required to have a tendency to establish either that, at the time of the commission of the crime, appellant was laboring under such a defect of reason that he was incapable of knowing the nature and quality of his act, or, if he was so capable, that he did not know that his act was wrong. 18 Pa.C.S. § 315(b); *Commonwealth v. Metzler,* 499 Pa. 122, 451 A.2d 1352 (1982); *Commonwealth v. Scarborough,* 491 Pa. 300, 421 A.2d 147 (1980); *Commonwealth v. Hicks,* 483 Pa. 305, 396 A.2d 1183 (1979).

 It is well-established that prior out-of-court verbal or non-verbal acts proximate in time to the commission of the crime may be admitted as evidence of a defendant's mental state where his sanity is at issue. *Commonwealth v. England,* 474 Pa. 1, 375 A.2d 1292 (1977); *Commonwealth v. Wright,* 455 Pa. 480, 317 A.2d 271 (1974); *Commonwealth v. Williams,* 307 Pa. 134, 160 A. 602 (1932). Such evidence "is offered as a response to environment, not to prove anything that may be asserted, and is not hearsay." C. McCormick, *Evidence* § 294, at 846 (3d ed. 1984) (footnote omitted). The poem in question would arguably have been admissible for such a purpose and made the subject of expert testimony as to the abnormality of the responses to environment expressed therein. The issue, however, is not the admissibility of the poem *as a writing;* the poem had already been admitted as a Commonwealth exhibit. Rather, the argument being advanced is that appellant's right to be heard encompassed the right to *read* the poem to the jury in open court, "with his own emphasis of meaning placed upon it [,]" Brief for Appellant at 14, as a means of establishing that the poem was not, as the Commonwealth had attempted to establish, merely a contrivance designed to support an insanity defense. In other words, the recital of the poem was intended to establish that the delusions portrayed therein were genuine through the manner in which the poem was read. While such a demonstration might have had a significant impact upon the jury, we are constrained to conclude that it was properly excluded as evidence.

In our adversary system of criminal justice, the defendant, like any other witness, is called to the stand to testify under oath by answering questions designed to elicit relevant facts. Appellant elected to take the witness stand, not to testify as to either the circumstances surrounding the crime or his mental condition during the commission of the crime, but to read a prepared statement, in verse form, directed at the jury. The obvious purpose of this statement was to dramatize appellant's purported delusions and display his demeanor, thus inducing a subjective response in the minds of the jurors as to his mental condition. Such a demonstration would have been subject to no evidentiary constraints and would have insulated the underlying testimonial assertion, i.e., that appellant was legally insane at the time of the crime, from meaningful cross-examination. Defense counsel had already been successful in presenting such "direct" evidence of insanity by placing appellant on the witness stand, albeit reluctantly, and eliciting testimony as to appellant's abnormal responses to being prosecuted for a capital offense. The Commonwealth was unable to cross-examine appellant as to his involvement in the crime. While the jury was ultimately instructed to decide the case as if appellant had not exercised his right to be heard, RR. 797a, 849a, the jury's reactions to appellant's answers and demeanor undoubtedly were somewhat successful in creating the desired impression. Any further attempt to demonstrate appellant's alleged mental illness would have taken the proceedings out of the realm of the factfinding process and into that of inflammation and speculation, if not that of theater, and it was within the discretion of the trial court to limit such a display on evidentiary grounds. *See Williams v. Philadelphia Transportation Co.*, 415 Pa. 370, 203 A.2d 665 (1964) (trial judge has responsibility of proper conduct of trial and has wide discretion to hold examination of parties within bound); *Commonwealth v. Dress*, 354 Pa. 411, 47 A.2d 197 (1946) (examination of witnesses is subject to control of trial court in whom is vested large discretion).

■ Appellant's next argument is also framed under the rubric of "the right to be heard." In this instance he complains that he was denied the right to be heard *by counsel* because the trial court restricted defense counsel's comments on appellant's Veterans Administration psyciatric records in his closing argument to those records utilized by appellant's expert witness in his testimony. We find that this limitation was appropriate. Closing argument must be limited to facts in evidence and legitimate inferences therefrom. *Commonwealth v. Anderson,* 490 Pa. 225, 415 A.2d 887 (1980); *Commonwealth v. Brown,* 489 Pa. 285, 414 A.2d 70 (1980); *Commonwealth v. Adkins,* 468 Pa. 465, 364 A.2d 287 (1976). Appellant's psychiatric records contained opinions and prognoses made by numerous doctors who were not present as witnesses. The professional opinions expressed in those reports were thus inadmissible hearsay. *Commonwealth v. Milburn,* 488 Pa. 601, 413 A.2d 388 (1980); *Commonwealth v. Brown,* 462 Pa. 578, 342 A.2d 84 (1975). Appellant nevertheless maintains that his psychiatric records were admitted into evidence *in toto* without objection. It is true that the psychiatric records were admitted as a defense exhibit. RR 773a–774a. However, the trial court withheld its ruling on whether the exhibit could be examined by the jury during deliberations and subsequently ruled that the opinions in the exhibit were hearsay and not independently admissible. RR 791a. Thus it is obvious that the records were admitted solely for the purpose for which they had already been used, namely, as a source of information on which the defense phsychiatrist testified that he relied upon in forming his opinion as to appellant's mental condition at the time of the crime, not as independent substantive evidence on the issue of legal insanity. As such, it was appropriate for the trial court to limit defense counsel's comments on the opinions contained in the exhibit to those which formed a part of the expert's testimony.

Appellant next argues that the prosecution violated his Fifth Amendment privilege against self-incrimination by

eliciting testimony from a police officer concerning appellant's "tacit admissions" in the course of questioning regarding Mrs. Jermyn's death. The relevant portion of the testimony was the following exchange:

Q. Now, did you ever confront him, sir, with the fact that you believed he was in fact the primary suspect in this case?

A. Yes, I did.

Q. I want you to specifically look at the transcript, what was his response to that?

MR. LYSAGHT: Your Honor, I want to put my objection to this once again on the record.

THE COURT: That is a continuing objection, and overruled. You may answer the question, sir.

THE WITNESS: When I told him I thought he was the one that committed the homicide his response was, "Really".

BY MR. EBERT:

Q. Did he seem excited at all, was he indignant?

A. Not at all.

Q. *Did he ever deny it?*

A. *No, he did not.*

Q. Did you make the accusation again?

A. Yes.

Q. And what was his response at that time?

A. I'll quote from the transcript, "Well, if you feel froggy go ahead and arrest me."

THE COURT: If you feel what?

THE WITNESS: Froggy.

THE COURT: Froggy?

BY MR. EBERT:

Q. Spell that?

A. F-R-O-G-G-Y.

Q. Did you confront him, again on page 48, about his involvement in this particular act?

A. Yes, I did.

Q. And what did he say at that time?

A. His first response was, "It sounds like you got it all figured out in your mind." And a second response was, "I'm not saying one way or another, you tell me whether I'm under arrest."

Q. *He never denied killing his mother?*

A. *He did not.*

MR. EBERT: Thank you, cross examine.

THE COURT: Mr. Lysaght.

MR. LYSAGHT: Thank you.

## CROSS EXAMINATION

BY MR. LYSAGHT:

Q. Corp. Weir, did he ever admit killing his mother?

A. No, he did not.

Q. Now, doesn't the Fifth Amendment to the Constitution provide that none of us have to admit or deny anything?

A. As far as I know, yes, sir.

RR. 552a–554a.

 The basis for the exclusion from evidence of a defendant's *silence* in the face of an accusatory statement by the police is the injustice of penalizing the exercise of the privilege against self-incrimination. *Commonwealth v. Jefferson*, 430 Pa. 532, 243 A.2d 412 (1968); *Commonwealth v. Dravecz*, 424 Pa. 582, 227 A.2d 904 (1967). That principle does not extend to instances in which the defendant does not remain silent but instead volunteers equivocal responses to police questioning. *Commonwealth v. Jefferson, supra.* In the instant case appellant did not exercise his right to remain silent. He elected to respond to the police officer's accusations in an equivocal fashion, neither admitting nor

denying guilt but implicitly challenging the police to prove their charge. To that extent the introduction of his statements does not amount to a Fifth Amendment violation. Once a suspect elects to make responses, the import of those responses are properly available for the jury's consideration. In such a case the right to remain silent is not implicated. The evasiveness of such answers can properly . be considered by the factfinder and inferences drawn therefrom. *See Commonwealth v. Gockley,* 411 Pa. 437, 192 A.2d 693 (1963); *Commonwealth v. Dickerson,* 406 Pa. 102, 176 A.2d 421 (1962); *Commonwealth v. Kravitz,* 400 Pa. 198, 161 A.2d 861, *cert. denied,* 365 U.S. 846, 81 S.Ct. 807, 5 L.Ed.2d 811 (1960); *Commonwealth v. Bolish,* 381 Pa. 500, 113 A.2d 464 (1955).

█ Appellant also raises an evidentiary issue concerning the admissibility of his mother's 1984 will, which revoked a prior will naming him as sole heir and executor, and provided in pertinent part as follows:

2.

I give my real estate situate at 305 James Street, Mechanicsburg, Pennsylvania, to my niece, Sharon E. Isralow, of Washington, D.C., on condition that she reside in the same as soon as convenient for her. If my niece declines to live in said residence, then I direct my real estate be sold and the net proceeds divided equally between my niece, Sharon E. Isralow, and my son, Fredric J. Jermyn, share and share alike; said division, however, shall be expressly conditioned on my death occurring from natural or accidental causes, which shall be determined by my Executor, in his sole discretion.

3.

All the rest, residue and remainder of my estate, real, personal and mixed, of whatsoever nature and wheresoever situate, I give, devise and bequeath to my niece, Sharon E. Isralow.

RR. 897a–898a.

Appellant attempts to characterize the condition imposed in the last sentence of paragraph two of the Will as a hearsay statement offered as substantive proof of his intent to kill his mother. We disagree. The significant aspect of the 1984 Will is that it established that Mrs. Jermyn had drastically altered her plans for the disposition of her estate, making a niece the primary beneficiary. Under the new Will appellant was to receive half the proceeds of the sale of his mother's home only if (1) her niece declined to live there, and (2) Mrs. Jermyn died of natural or accidental causes. It could properly be inferred from those actions that Mrs. Jermyn's relationship with appellant had greatly deteriorated and that she was apprehensive about her safety during the period immediately preceding her death. The Will was clearly admissible to prove the victim's state of mind. *See, e.g., Commonwealth v. Riggins*, 478 Pa. 222, 386 A.2d 520 (1978); *Commonwealth v. Thomas*, 410 Pa. 160, 189 A.2d 255, *cert. denied*, 375 U.S. 856, 84 S.Ct. 118, 11 L.Ed.2d 83 (1963); *Commonwealth v. Wilson*, 394 Pa. 588, 148 A.2d 234, *cert. denied*, 361 U.S. 844, 80 S.Ct. 97, 4 L.Ed.2d 82 (1959). Moreover, because the terms of the new Will had been communicated to appellant, the Will established that he had a financial motive to kill his mother in circumstances which made her death appear to have been accidental. "Evidence to prove motive, or intent, or plan, or design, or ill will or malice is always admissible." *Commonwealth v. Kravitz, supra*, 400 Pa. at 216, 161 A.2d at 870. *Accord, Commonwealth v. Riley*, 458 Pa. 390, 326 A.2d 384 (1974); *Commonwealth v. Glover*, 446 Pa. 492, 286 A.2d 349 (1972); *Commonwealth v. Faison*, 437 Pa. 432, 264 A.2d 394 (1970).

Appellant next maintains that the trial court erred in denying his motion to bifurcate his trial pursuant to the Mental Health Procedures Act, Act of July 9, 1976, P.L. 817, § 101 *et seq.*, 50 P.S. § 7101 *et seq.* (Supp.1987). A motion filed on appellant's behalf stated that he had represented his innocence to defense counsel, who would be substantially handicapped in presenting a defense unless the issue of insanity were submitted to a different jury

from the one which determined appellant's guilt or innocence. Section 404(c) of the Act in question provides:

(c) Bifurcation of Issues or Trial.—Upon trial, the court, in the interest of justice, may direct that the issue of criminal responsibility be heard and determined separately from the other issues in the case and, in a trial by jury, that the issue of criminal responsibility be submitted to a separate jury. Upon a request for bifurcation, the court shall consider the substantiality of the defense of lack of responsibility and its effect upon other defenses, and the probability of a fair trial.

50 P.S. § 7404(c).

This Court had occasion to explain the proper application of section 404(c) in *Commonwealth v. Murphy*, 493 Pa. 35, 425 A.2d 352 (1981):

By its terms the statute directs that the determination as to whether such a request should be granted should turn upon "the substantiality" of the insanity defense and its "effect upon other defenses." We would readily agree there would be serious question as to whether the fair trial standard of section 404(c) could be satisfied if one with a substantial insanity claim were forced to assert it before the same fact tribunal that was being called upon to assess an alternative claim of defense of another. The insanity defense is premised upon the contention that the actor did not know the nature and quality of the act or could not perceive the distinction between right and wrong. *Commonwealth v. Hicks*, 483 Pa. 305, 396 A.2d 1183 (1979); *Commonwealth v. Bruno*, 466 Pa. 245, 352 A.2d 40 (1976); *Commonwealth v. Demitt*, 456 Pa. 475, 321 A.2d 627 (1974). The incompatibility with a defense of justification, such as defense of a third party, is evident. Thus the validity of this complaint must depend upon "the substantiality" of the insanity defense raised here.

*Id.*, 493 Pa. at 39–40, 425 A.2d at 354 (footnote omitted).

In the instant case appellant attempts to argue that two incompatible "defenses" were being pursued, that of insani-

ty and that of "total innocence." That argument rests, however, on the fallacy that innocence can be cognizable as a defense under section 404(c). A criminal defendant enjoys a *presumption* of innocence in all cases, including those in which the defense of insanity or any of the other defenses to culpability is invoked. The Commonwealth always bears the burden of proving the defendant's guilt beyond a reasonable doubt. The defendant's desire to present evidence that he did not commit the offense charged does not inject an additional issue of fact into the case which would justify bifurcation. The fact that such evidence would be inconsistent with the defense of insanity, which is appellant's principal complaint, is an inevitable consequence of the decision to rely on that defense, and one from which section 404(c) offers no relief.

 Next in appellant's sequence of complaints is the failure of the trial court to grant a mistrial on the basis of a comment made by that court during redirect examination of appellant's expert psychiatric witness. After lengthy cross-examination by the prosecution, defense counsel attempted to ask the psychiatrist, Paul F. Phillips, M.D., the following question:

> Q. One final question, sir, didn't you, in fact, receive a telephone call from a Mr. Skip Ebert requesting your services in this case?
>
> RR. 772a.

Mr. Ebert, the Assistant District Attorney prosecuting the case, promptly objected to the question. The trial court sustained the objection, finding the question irrelevant, and added: "Who gets hired on a particular case often depends on who calls first." RR 773a. Defense counsel did not move for a mistrial at that point, but requested a curative instruction to the jury the following day. The trial court agreed to a curative instruction; defense counsel then decided that such an instruction would not be sufficient and moved for a mistrial. That motion was denied.

Appellant first argues that whether or not the prosecution had attempted to procure the services of the defense

▬▬▬▬

expert witness was relevant to establishing the psychiatrist's qualifications. He does not, however, argue that the exclusion of such testimony was prejudicial, and we see no need to address that evidentiary question. As to the trial court's comment, appellant argues:

> The judge's remark to the jury created, by innuendo, a message that the trial judge viewed such expert testimony skeptically and an even clearer and more important message that in order to be "hired" such experts might form an opinion supporting the contention of whichever side contacted them first.

> Brief for Appellant at 34.

Appellant's theories as to the impact of the trial court's remark are pure speculation and cannot fairly be inferred from the comment actually made. Moreover, the trial court's curative instruction unquestionably served to disperse any possible misunderstanding as to the proper evaluation of the expert witness' testimony:

> One last comment, I apparently made some comment at the end of Mr. Phillips' testimony yesterday after I sustained an objection to counsel's question as to whether or not the Commonwealth had called on Mr. Phillips. Let me say this, put aside any comment I may have made, don't consider it, the important thing with regard to expert witnesses, and both of these sides have for various purposes called expert witnesses in this case, are both the Commonwealth and the defendant in criminal cases, both the plaintiff and the defendant in civil cases, are allowed under our law to retain expert witnesses, in other words, people who have special knowledge in particular fields and present their testimony if relevant in a court proceeding in order to aid a jury in determining the facts of the case. Whether a particular witness on a particular occasion testifies for the Commonwealth or the defendant, or whether plaintiff or defendant in a civil case, isn't the important matter, the important matter is whether or not in a particular case when a witness testifies for a particular individual whether or not you accept that testimony

and allow it to aid you in making a determination of the facts, remembering again that expert testimony, like all other testimony, is for you to judge the credibility and weight because ultimately witnesses don't decide this case, counsel nor myself don't decide this case, you must decide what the facts of the case are, and I will charge you further on expert testimony when I charge you later.

RR. 797a–798a.

Appellant also argues that trial counsel was ineffective in failing to brief and thus abandoning[2] a post-verdict motion challenging the admissibility of statements made by appellant to the police during interviews on January 3 and 4, 1985, on the ground that he was subjected to custodial interrogation without being given *Miranda* warnings. We disagree. This Court has repeatedly held that trial counsel will not be held ineffective for failing to preserve meritless claims. *See, e.g., Commonwealth v. Rawles,* 501 Pa. 514, 462 A.2d 619 (1983); *Commonwealth v. Upsher,* 497 Pa. 621, 444 A.2d 90 (1982); *Commonwealth v. Smallwood,* 497 Pa. 476, 442 A.2d 222 (1982); *Commonwealth v. Penn,* 497 Pa. 232, 439 A.2d 1154, *cert. denied,* 456 U.S. 980, 102 S.Ct. 2251, 72 L.Ed.2d 857 (1982); *Commonwealth v. Ciotti,* 496 Pa. 232, 436 A.2d 983 (1981); *Commonwealth v. Butler,* 495 Pa. 82, 432 A.2d 590 (1981). "The test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate *Miranda* warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation." *Commonwealth v. Chacko,* 500 Pa. 571, 577, 459 A.2d 311, 314 (1983). *See also Commonwealth v. Meyer,* 488 Pa. 297, 412 A.2d 517 (1980); *Commonwealth v. Brown,* 473 Pa. 562, 375 A.2d 1260 (1977); *Commonwealth*

---

2. The trial court's opinion states that the Cumberland County Rule of Civil Procedure 210–7 provides: "Issues raised, but not briefed, shall be deemed abandoned." That rule does not appear in the current edition of the Rules of Court of the Ninth Judicial District. However, the present Rule 210–4, which applies in civil and criminal proceedings, provides: "Matters not argued in the brief shall be deemed abandoned."

*v. Fisher*, 466 Pa. 216, 352 A.2d 26 (1976); *Commonwealth v. O'Shea*, 456 Pa. 288, 318 A.2d 713, *cert. denied*, 419 U.S. 1092, 95 S.Ct. 686, 42 L.Ed.2d 685 (1974). The January 3 interview was conducted in appellant's motel room, with his consent. The January 4 interview was conducted in a room in the Mechanicsburg Borough Building, to which appellant had to be driven by the police because he had experienced car trouble. The room used was not part of the police station. Appellant was specifically told he was not under arrest and was free to leave at any time. Appellant chose to speak with the police. Neither interview can properly be characterized as a custodial situation or one which could reasonably be so perceived. This claim is therefore without merit and trial counsel cannot be deemed ineffective for failing to pursue it.

 Appellant's final argument with respect to the guilt determination stage of his trial is that the trial court erred in refusing to sequester the jury and failed to question jurors individually regarding exposure to media coverage during the course of the trial. Rule 1111 of the Pennsylvania Rules of Criminal Procedure provides in pertinent part:

> (a) The trial judge may, in his discretion, order sequestration of trial jurors in the interests of justice.

Pa.R.Crim.P. 1111(a).

Our standard of review in this area is well-established:

> [T]he disposition of a motion to sequester the jury is within the discretion of the trial court. Pa.R.Crim.P. 1111(a). And the decision of the court will not be reversed unless the court "abused its discretion or committed an error of law which controlled the outcome of the case." *Commonwealth v. Stoltzfus*, 462 Pa. 43, 52, 337 A.2d 873, 877 (1975). However, there are, of course, certain circumstances where adverse publicity attendant to the trial is so pervasive, intense and prejudicial that the law will presume the jury's deliberations were affected by it. *Commonwealth v. Bruno*, 466 Pa. 245, 352 A.2d 40 (1976).

> In highly publicized or sensational cases a number of alternatives are available to the court to preserve the integrity of the factfinding process. In most cases, however, admonitions to the jury such as those which appear in the ABA Projection Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press § 3.5(e) (Tentative Draft, 1966) will suffice. And in such cases appellate courts will presume the efficacy of cautionary instructions unless actual prejudice is demonstrated. *Stoltzfus, supra,* 462 Pa. at 55, 337 A.2d 873.
>
> *Commonwealth v. Tolassi,* 489 Pa. 41, 51–52, 413 A.2d 1003, 1008 (1980).

The media coverage of the instant case does not appear to have been sensational or extensive. The trial court scrupulously gave the jury repeated cautionary instructions throughout the trial to avoid newspapers and radio and television broadcasts, and questioned the jury as to any exposure to media reports of the trial. We are satisfied that under the circumstances of this case such instructions protected appellant's right to an unbiased jury. Moreover, no showing of actual prejudice has been made. This argument is therefore without merit. *See Commonwealth v. Tolassi, supra.*

The remaining issues raised by appellant concern the sentencing phase of the proceedings. His first argument is that the only aggravating circumstance found in this case, that "the defendant committed a killing while in the perpetration of a felony, "42 Pa.C.S. § 9711(d)(6), should not have been submitted to the jury. The felony in question was arson endangering persons, 18 Pa.C.S. § 3301(a)(1). The relevant section of the Crimes Code provides as follows:

§ 3301. Arson and related offenses.

(a) Arson endangering persons.—

(1) A person commits a felony of the first degree if he intentionally starts a fire or causes an explosion, or if he aids, counsels, pays or agrees to pay another to cause a fire or explosion, whether on his own property or on that of another, and if:

(i) he thereby recklessly places another person in danger of death or bodily injury, including but not limited to a firefighter, police officer or other person actively engaged in fighting the fire; or

(ii) he commits the act with the purpose of destroying or damaging an inhabited building or occupied structure of another.

18 Pa.C.S. § 3301(a)(1).

The theory underlying appellant's argument is that evidence of the commission of a lesser included offense of first degree murder cannot be used to establish the aggravating circumstance at issue, a premise which is not questioned by the Commonwealth. Appellant argues that the arson charge of which he was convicted was not a "separate" offense because arson was the *means* employed to accomplish the murder and was thus a lesser included offense. We cannot agree. Arson endangering persons is a distinct offense with essential elements which are not necessary elements of first degree murder. In this Court's recent decision in *Commonwealth v. Williams*, 514 Pa. 124, 522 A.2d 1095 (1987), it was argued that the imposition of separate sentences for arson endangering persons and attempted murder violated merger principles.

█ In *Commonwealth v. Williams, supra*, we made the following pertinent observations concerning the operation of the merger doctrine.

In the case before us, the Appellee, on the basis of a single act, was sentenced on two crimes, arson endangering persons and attempted murder of the first degree. Arson, as pertinent here, is defined by § 3301(a) (1973), as the intentional starting of a fire ... thereby recklessly placing another person in danger of death or bodily injury. Criminal attempt (murder of the first degree) is defined in §§ 901 and 2502 of the Crimes Code. Under § 901(a), a person commits an attempt when with intent to commit a specific crime he does any act which consti-

tutes a substantial step toward the commission of that crime. Under § 2502(a), a criminal homicide constitutes murder of the first degree when committed by an intentional killing. Here, the Appellee intended to, and did, accomplish the crime of arson, and he also intended, and attempted but failed, to accomplish three killings in the perpetration of arson. Obviously, the crime of attempted murder is of a class separate from the crime of arson and each class involves proof of one or more factual elements not common to the other. In order to prove attempted first degree murder, the Commonwealth had to prove a specific intent to kill. Mere evidence of the intentional setting of a fire does not prove intent to kill. Appellee's intent to kill was proven by evidence of his state of mind just prior to setting the fire. Thus, the crimes involve separate essential elements for which additional evidence was necessary. Intent to endanger persons is not a necessary element of arson endangering persons; the intentional setting of a fire must merely result in recklessly placing another in danger of death or bodily injury. Thus, the state of mind evidence that Appellee intended to kill the occupants was not necessary to prove the arson, but was necessary to prove the attempted first degree murder. There is no reason in law or logic to conclude that a criminal who deliberately chose to commit both arson and murder by the same incendiary course of conduct necessarily and as a matter of law committed but one crime which can only be subjected to one punishment.

*Id.*, 514 Pa. at 136, 522 A.2d at 1101.

The above analysis makes clear that arson endangering persons and first degree murder remain separate offenses regardless of the fact that a deliberate setting of a fire was the instrumentality by which the killing was accomplished. The jury's finding of murder in the first degree resulted from their determination that the killing of the victim was accompanied by a deliberate intent to bring about the death of the victim. That result would obtain without regard to

whether the means used also satisfied the requirements of section 3301(a)(1). The fact that the jury also found that appellant had indeed violated section 3301(a)(1) is properly considered as an aggravating circumstance because by employing this means he had recklessly exposed persons other than the intended victim to injury or death. Thus the instant objection is without merit.

Appellant's next argument relating to the imposition of the death penalty is that the sentence in the instant case is excessive or disproportionate to the penalty imposed in similar cases. Subsection (h) of our death penalty statute, entitled "Review of death sentence," provides in pertinent part:

(3) The Supreme Court shall affirm the sentence of death unless it determines that:

* * * * * *

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. § 9711(h)(3)(iii).

In order to facilitate our review of the proportionality of death sentences, this Court, in *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700, *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984), ordered the performance of an ongoing comprehensive study of all Pennsylvania cases in which the defendant was convicted of first degree murder since the effective date of the present death penalty statute.

For each such case, information has been compiled concerning the age, race and sex of the defendant and the victim, whether the death penalty was sought, the aggravating and mitigating circumstances presented and the evidence relating thereto, the sentence imposed, related charges and the disposition thereof, and data concerning any co-defendants. This study, entitled "Pennsylvania Death Penalty Study," is maintained by the Administra-

tive Office of Pennsylvania Courts and is made available by that office free of charge.

*Commonwealth v. DeHart, supra,* 512 Pa. at 260, 516 A.2d at 669.

■ Having carefully examined the relevant data, we have concluded that the sentence of death imposed in the instant case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering the circumstances of the crime and the character and record of the accused.

Appellant next argues that trial counsel was ineffective *per se* in failing to "life qualify" prospective jurors during *voir dire, i.e.,* to eliminate from the jury individuals who would not, in a proper case, impose a sentence of life imprisonment. Appellant presents no authority in support of this theory but instead attempts to argue that the absence of case law in this area indicates that it "goes without saying" that defense counsel must "life qualify" prospective jurors. As this Court has recently made clear, trial counsel will not be found to have rendered ineffective assistance absent a showing of prejudice to his client's case. *Commonwealth v. Saxton,* 516 Pa. 196, 532 A.2d 352 (1987); *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987). Thus, in order to prevail on the instant issue it would be incumbent upon appellant to demonstrate that trial counsel's failure to sepcifically ask prospective jurors if they would automatically vote to impose the death penalty resulted in the impanelling of a jury on which one or more jurors were so predisposed. However, this issue is raised purely in the abstract, in that no challenge has been raised as to the overall performance of trial counsel in conducting *voir dire.* In this context it is to be noted that the proceedings have not even been made a part of the record.[3] This alone would justify rejecting the instant argument.

3. Pursuant to Rule 1106(c) of the Pennsylvania Rules of Criminal Procedure, the record of a *voir dire* is transcribed only upon written request of either party or order of the trial judge.

 The purpose of *voir dire* is to empanel a fair and impartial jury which will apply the law in accordance with the instructions of the trial court. Both general and specific questions are directed to prospective jurors under oath in an effort to ferret out evidence of bias and prejudice. Those veniremen who express an inability to render a fair and impartial decision are subject to a challenge for cause. In addition, those venirepersons thought to be unfavorably disposed to the positions of the respective parties may be removed through the exercise of peremptory challenges. The mere fact that counsel may not have posed the specific question as to whether a prospective juror would vote for a sentence of life imprisonment in an appropriate case does not justify the conclusion that counsel failed to assure that a fair and impartial jury was selected. Such a talismanic requirement would clearly place form above substance.

 Appellant also argues that the trial court erred in refusing his request for a separate jury to determine his guilt or innocence, presumably one that would not be death-qualified pursuant to *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Appellant concedes that the United States Supreme Court has determined that such separate juries are not required as a matter of federal constitutional law, *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), but argues that this Court should find such a requirement in the guarantees of the Pennsylvania Constitution. The theoretical underpinning of this bifurcation argument is, of course, that death-qualified juries are "prosecution-prone," a contention that has been consistently rejected by this Court on state as well as federal constitutional grounds. *See Commonwealth v. DeHart, supra*, 512 Pa. at 250 n. 8, 516 A.2d at 664 n. 8. Moreover, we have specifically held that those holdings are fatal to the two-jury argument. *Id.*, 512 Pa. at 252 n. 9, 516 A.2d at 665 n. 9. Appellant

suggests no ground for overruling those decisions. This claim is therefore without merit.

■ Appellant's final argument is that the trial court erred in refusing to instruct the jury as to their right to reach a non-unanimous sentencing verdict. This argument relies on two statements of the trial court taken out of context:

Remember again your verdict must be unanimous, it cannot be reached by a majority vote or by a percentage vote, it must be a verdict of each and every one of you. RR. 1113a.

\* \* \* \* \* \*

Remember your verdict with regard to all these findings must be unanimous. When you reach a unanimous verdict, Madam Foreman, you will sign it, date it, you will return it with your verdict to this Court.
RR. 1114a.

Appellant maintains that the jury was thus informed that a verdict of life imprisonment could only be reached by a unanimous vote. We disagree. The trial court instructed the jury, precisely tracking the language of section 9711(c)(1)(iv) of the Sentencing Code, 42 Pa.C.S. § 9711(c)(1)(iv), as follows:

The verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance as provided by the Commonwealth and no mitigating circumstances, or if the jury unanimously finds one or more aggravating circumstances which outweighs any mitigating circumstances.

*In all other cases the verdict must be a sentence of life imprisonment.*

RR. 1107 (emphasis added).

Taken in their proper context, the trial court's explanation of unanimity clearly related to the requirement of unanimity with respect to a sentencing verdict of death. It is clear from the trial court's instructions that, absent such a unani-

mous verdict, a verdict of life imprisonment must be imposed. Moreover, a separate instruction on the right of the jury to reach a non-unanimous verdict of life imprisonment would have been superfluous and could possibly have improperly encouraged such a finding. *Cf. Commonwealth v. Patrick*, 416 Pa. 437, 206 A.2d 295 (1965).

Accordingly, for all of the foregoing reasons, the judgments of sentence are affirmed.[4]

HUTCHINSON, J., files a concurring and dissenting opinion.

HUTCHINSON, Justice, concurring and dissenting.

I concur with the Court that the jury's finding of guilt should be affirmed, but do not adopt all its reasoning on that issue. I dissent, however, from its mandate affirming the death sentence. I cannot agree that our Legislature intended to include in the sixth aggravating circumstance the means of death when their use would be an independent felony if death had not occurred. *See* 42 Pa.C.S. § 9711(d)(6).

*Commonwealth v. Williams*, 514 Pa. 124, 522 A.2d 1095 (1987), relied on by the Court, deals with merger of offenses and the related, but distinct, concept of double jeopardy. I do not think it sheds light on the wholly different question of where the Legislature drew the line between the malicious, premeditated killings which define first degree murder and the more limited included class of malicious, premeditated killings which warrant imposition of a death sentence. I would therefore vacate the death sentence and remand to the Court of Common Pleas of Cumberland County for imposition of a life sentence. *See* 42 Pa.C.S. § 9711(h)(2).

4. The Prothonotary of the Middle District is directed to transmit, as soon as possible, the full and complete record of the trial, sentencing hearing, imposition of sentence, and review by this Court to the Governor. 42 Pa.C.S. § 9711(i).